**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT KNOXVILLE**

**JANUARY 1997 SESSION**

FILED

December 23, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **LEONARD D. HUTCHISON,** | ) | |
| **and JAMES HARPER** | ) | No. 03C01-9606-CR-00232 |
| | ) | |
| Appellees, | ) | |
| | ) | Knox County |
| vs. | ) | |
| | ) | Hon. Richard R. Baumgartner, Judge |
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| | ) | (Post-Conviction - State's Appeal) |
| Appellant. | ) | |

FOR THE APPELLANT:

JOHN KNOX WALKUP
Attorney General & Reporter

MERRILYN FEIRMAN
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493

MICHAEL L. FLYNN
District Attorney General
5th Judicial District
PHILLIP H. MORTON
Assistant District Attorney General
363 Court St.
Maryville, TN 37804-5906

FOR THE APPELLEES:

ROBERT C. EDWARDS
Attorney for Leonard D. Hutchinson
707 Market St.
Knoxville, TN 37902

RAYMOND A. SHIRLEY, JR.
Attorney for James Harper
603 Main Ave.
Knoxville, TN 37902

OPINION FILED: _____

**REVERSED AND REMANDED**

CURWOOD WITT
JUDGE

**OPINION**

The appellees, Leonard D. Hutchison and James Harper, were convicted of burglary of an automobile and assault with the intent to commit second degree murder on November 1, 1985. Hutchison had previously been convicted of grand larceny in 1983 and possession of burglary tools in 1984. Their convictions were affirmed on direct appeal. See State v, Harper and Hutchison, 753 S.W.2d 360 (Tenn. Crim. App. 1987), perm. app. denied (Tenn. Oct. 19, 1987). Hutchison filed a petition for post-conviction relief on August 29, 1988, and Harper filed his petition on January 21, 1993. Following an evidentiary hearing on January 22, 1996, the trial court granted the defendants' petitions finding that the state's failure to provide the defendants with information about an exculpatory witness from the Federal Bureau of Investigation that was material violated the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963), and that a reasonable probability existed that had the evidence been disclosed to the defendants, the result of the proceedings would have been different.

The state now appeals contending that

I.      The state has no duty under Brady v. Maryland to turn over exculpatory information of which it has no knowledge and over which it has neither possession nor control.

II.     Harper's petition for post-conviction relief, filed on January 21, 1993, six years after the Tennessee Supreme Court denied his application for permission to appeal, is barred by the statute of limitations.

The petitioners raise the following issue:

III.    Whether the trial court should have granted a new trial because the prosecution breached its duty to furnish exculpatory evidence by withholding an obviously exculpatory lab report and by allowing state witnesses to testify in direct contradiction to its results. (This exculpatory-evidence issue is separate and distinct from the exculpatory-evidence issue mentioned above.)

For the reasons discussed below, we reverse the trial court's judgment granting post-conviction relief because the state failed to provide the petitioners with information possessed by the Federal Bureau of Investigation about an exculpatory witness. As to the second exculpatory-evidence issue, we remand the case to the trial court for consideration of Hutchison's claim that the prosecution breached its duty to disclose exculpatory evidence by failing to provide laboratory reports prepared by the F.B.I. and by allowing state witnesses to testify in contradiction to those results.

Because the facts surrounding this appeal are convoluted and complex, we must discuss them in some detail. During the early morning hours of Sept. 1, 1982, the victim, James David Comer, was disturbed by tapping sounds which came from the parking lot in the apartment complex in which he lived. He arose and stepped out onto the balcony. He shined a powerful flashlight into a 1980 Oldsmobile Cutlass belonging to Jane Marie Wells. Two men immediately emerged from the car and ran away across the lot. Comer dialed 911 but set the telephone down without waiting for an answer. He ran downstairs to his car. He was driving around the area looking for the men when he encountered an "old junker" covered with purplish red primer. He more or less forced the car to the curb. Approaching the driver's side window with his gun in his hand, he told the two men that they had been caught and that the police were on the way. The driver gunned the car and, as Comer rolled back across the trunk lid, he was struck by a bullet. He fired one shot at the car before he was hit twice more. The car then sped away. The next day, when Comer viewed a photographic line-up prepared by officers from the auto theft division of the Knoxvillle Police Department, he identified the petitioner, Leonard Hutchison, as the driver of the car. Hutchison was arrested, and the police seized a bag containing tools commonly used in the theft of automobiles and a 1970 Ford Mustang painted in red primer. Based on a telephone call Hutchison made to James Harper from the booking room at the jail, Harper's picture was also placed in a photo array. When Comer identified Harper's photograph as

being that of the second thief, the police arrested Harper. Neither Hutchison nor Harper gave a statement to the police, and both men have maintained their innocence throughout.

At the first trial in December, 1984, Hutchison and Harper raised an alibi defense and testified on their own behalf. The jury found Hutchison guilty of the possession of burglary tools but was unable to reach a verdict on the other charges.[1] The defendants retained successor counsel and were retried on August 5, 6, and 7, 1985.[2] Hutchison rested without putting on any proof, and Harper's ex-wife and a nurse testified about Harper's medical condition. Each defendant was convicted of burglary of an automobile and of assault with the intent to commit second degree murder.[3]

The convictions in this case, however, are only the beginning of the story. At some point prior to the first trial, the defendants became aware that a person named Tommy McClanahan had information that might exculpate them. The record indicates that on February 6, 1984, Harper's attorney moved for a continuance in order to locate and interview McClanahan. McClanahan did not testify, but during Harper's testimony at the first trial, Harper blurted out that "Billy Hall" was the "shooter." At the post-conviction hearing, Hutchison testified that at some point, probably between the first and second trial, he was visited by two F.B.I. agents who told him that they had information indicating that Billy Hall and someone else had actually committed the burglary and the assault. Both defense counsel

---

[1] The trial judge sentenced Hutchison to serve ten years as a Range II persistent offender. This court affirmed his conviction and sentence in State v. Leonard D. Hutchison, No. 1028 (Tenn. Crim. App., Knoxville, July 23, 1987).

[2] At the first trial, Ray Cate represented Leonard Hutchison and Don Coffey was counsel for James Harper. Doug Trant served as defense counsel for Hutchison at the second trial, and Harper retained Ray Shirley.

[3] As a Range I offender, Harper received concurrent sentences of five years for burglary and three years for assault. Hutchison, a Range II offender, was sentenced to consecutive sentences of ten years for burglary and five years for assault. This court affirmed their convictions in State v. Harper, 753 S.W.2d 360 (Tenn. Crim. App. 1988). Harper's sentence expired on Feb. 21, 1992. Hutchison was paroled on March 22, 1996.

and the prosecutor testified that the defense had subpoenaed Billy Hall and that he was present throughout the second trial. The state paraded Hall before the jury at one point, but he was never placed on the stand. Hutchison's counsel at the second trial had Tommy McClanahan hidden in his office, and he intended to use McClanahan to impeach Hall's testimony. The plan fell apart, however, when McClanahan disappeared on the last day of the trial.

In October, 1985, while the defendants were awaiting sentencing, Richard O'Rear, a supervisor in the Knoxville F.B.I. office, visited Hutchison at Hutchison's request. As a result of this meeting, O'Rear met with Agent Clyde Merryman who had worked in an undercover investigation of East Tennessee auto theft rings in 1982. He told O'Rear that on September 2, 1982, he and Agent Joe Mann had, as part of their undercover activities, spoken with Paul Allen, who ran a "chop-shop" in Newport, and Tommy McClanahan, who also was involved in car theft activity. In separate conversations, McClanahan and Allen told them that Billy Hall admitted that he was the man who shot James David Comer. According to the agents, Hall brought his primer-covered 1968 Pontiac to Allen to be "chopped" because it might be identified. Hall allegedly pointed out a bullet hole in the car. Neither McClanahan nor Allen knew the true identity of the agents, and Merryman and Mann found their information to be highly credible. However, since they were operating deep undercover, they decided to call another agent, Rex Owenby, who had contacts within the Knoxville Police Department and give him the information.[4] Contrary to F.B.I. procedure, no one made a written record of this information.

After meeting with Hutchison, O'Rear asked Merryman to interview McClanahan and Allen again. At the second interviews, both Allen and McClanahan knew that Merryman was an F.B.I. agent but both men told

---

[4] Nothing in the record indicates that Owenby ever supplied the information to the Knoxville Police Department. Owenby did not take the stand at the post-conviction hearing. The parties stipulated that he had no recollection of receiving the information from Agent Mann.

substantially the same story as they had in 1982. Merryman then memorialized the interviews on what are known in F.B.I. parlance as "302 forms." [5] As a result of these interviews, O'Rear sent a letter to the Knox County District Attorney General on January 9, 1986 advising him that the F.B.I. had information that tended to exculpate Hutchison and Harper. He forwarded copies of the 302 forms a month later. Shortly after McClanahan passed a polygraph test on August 24, 1986, the district attorney's office notified Doug Trant, Hutchison's attorney, that the F.B.I. had information concerning the crime for which Hutchison and Harper had been convicted.

Based on the conversations he had with representatives of the district attorney general's office and the F.B.I., Trant filed a Motion to Reopen on Hutchison's behalf on August 26, 1987. The motion was withdrawn without prejudice and then refiled on March 2, 1989. Judge Randy Nichols denied the motion that same day because it contained no affidavits from the alleged witnesses.[6] Meanwhile, Hutchison began writing letters to obtain the F.B.I. documents under the Freedom of Information Act, and he filed petitions for post-conviction relief in each of his convictions alleging both ineffective assistance of counsel and Brady violations.[7] James Harper filed a petition for post-conviction relief on January 21, 1993, alleging only that the state had violated Brady. Ultimately, the petitions were consolidated before a single judge and an evidentiary hearing was held on Feb. 1 and 2, 1995. The post-conviction court took the case under advisement and granted the petitions on January 22, 1996. On February 12,

---

[5]     The "302s" on Allen and McClanahan are dated November 14, 1985 and December 13, 1985 respectively.

[6]     This court affirmed the trial court's denial of the Hutchison's motion to reopen in State v. Leonard D. Hutchison, No. 1285 (Tenn. Crim. App., Knoxville, Nov. 7, 1990). Harper also filed a motion to reopen and his motion was also denied.

[7]     Hutchison filed three petitions: No. 33993 on August 29, 1988, No. 35138 on December 7, 1988, and No. 36742 on April 20, 1989. An amendment to No. 33993 was filed on Feb. 6, 1990. Petition No. 35138 concerned a different criminal episode and was not heard with the other petitions.

1996, the judge entered an amended Memorandum Opinion for record-keeping purposes.

The post-conviction judge made extensive factual findings concerning the information Agents Merryman and Mann had acquired from McClanahan and Allen. The memorandum finds that the defense did not have the information developed by the F.B.I. prior to trial, and that the information was material, clearly exculpatory, suppressed, and favorable to the defendants. Although no law enforcement agency or any member of the prosecution intentionally withheld evidence, the court concluded that, in this instance where the state utilized the F.B.I. laboratory to further its investigation of a case, it was fundamentally unfair and constitutionally suspect for the F.B.I. to supply the prosecution with some but not all of the material evidence in its possession. Lastly, the court found that, had the information been disclosed to the defendants prior to trial, a reasonable probability existed that the result of the proceedings would have been different. The trial court made no factual findings and drew no legal conclusions regarding the effectiveness of Hutchison's trial counsel, the second <u>Brady</u> issue involving the alleged suppression of the F.B.I. laboratory reports, or the state's argument that Harper's petition was barred by the statute of limitations. Based on its findings, the trial court granted the petitions for post-conviction relief.

The state appeals contending that <u>Brady</u> does not require the state to investigate for the defendant or to made blanket requests from every federal and state agency that might possibly have information when the state has no reason to believe that such information exists. The state also contends that James Harper's petition should be dismissed as barred by the statute of limitations.

## I. The Statute of Limitations

We begin by addressing the state's second issue which concerns only

**7**

James Harper's petition.  The trial court sentenced Harper to five years for burglary of an automobile and three years for assault with the intent to commit second degree murder in 1985.  This court affirmed his convictions on June 1, 1987.  Permission to appeal was denied on July 31, 1987.  As of July 1, 1986, the legislature limited the filing of petitions for post-conviction relief to "within three (3) years of the date of the final action of the highest state appellate court to which an appeal is taken. . . ."  Tenn. Code Ann. § 40-30-102 (1990) (repealed May 10, 1995 and replaced by Tenn. Code Ann. § 40-30-202(a) (Supp. 1996)).   Pursuant to the law at the time, Harper had until July 31, 1990 to file a petition for post-conviction relief.  The petitioner acknowledges that more than three years passed between the date of his convictions and the filing of his petition.   He contends that a strict and mechanical application of the statute would improperly cut off his right to raise a legitimate claim for relief with respect to the F.B.I. laboratory reports, see Burford v. State, 845 S.W.2d 204, 211 (Tenn.1992), and that the 1995 Post-Conviction Procedure Act provided him with a one-year window in which to file a claim regarding the suppression of the other information possessed by the F.B.I.

The 1995 Post-Conviction Procedure Act creates no window of opportunity for petitioner's claim.  Our supreme court recently held that the Act did not revive previously expired post-conviction petition claims.  Arnold Carter v. State, ---S.W.2d ---, No. 03S01-9612-CR-00117 (Tenn., Knoxville, Sept. 8, 1997).  Harper's petition is controlled by the law effective on the date it was filed in 1993, and his time for filing a petition expired on July 31, 1990 unless he is able to meet the requirements of Burford as interpreted in Sands v. State, 903 S.W.2d 297 (Tenn.1995).

In Burford, the Tennessee Supreme Court held that a strict and mechanical application of the statute of limitations denying a petitioner the opportunity to seek relief based upon legitimate but later-arising grounds would, under some circumstances, violate due process.  Burford, 845 S.W.2d at 210.   In

**8**

Sands, the supreme court concluded that the basic rule of Burford was that "due process prohibits the strict application of the post-conviction statute of limitations to bar a petitioner's claim when the grounds for relief, whether legal or factual, arise . . . after the point at which the limitations period would normally have begun to run." Sands v. State, 903 S.W.2d at 301. Justice Daughtery, in her concurrence in Burford, discusses a hypothetical situation in which evidence suppressed by the prosecution might surface many years after a trial was completed. 845 S.W.2d at 211. Harper contends that Daughtrey's hypothetical has become Harper's reality in this case.

In Sands, the supreme court established a three-step analysis to guide lower courts in applying the Burford rule to specific factual situations:

1.    A court should determine when the limitations period would normally have begun to run;[8]

2.    The court must determine whether the grounds for relief actually arose after the limitations period commenced;

3.    If the grounds are truly later arising, the court must consider whether a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present his claim.

903 S.W.2d at 301. In this case, the record readily establishes that in normal circumstances Harper's opportunity to file for post-conviction relief commenced on July 31, 1987 and ended on July 31, 1990. It is more difficult to determine whether the grounds for relief are truly later arising. Because Harper alleges that the state failed to provide him with two different kinds of exculpatory information, we must examine each separately.

---

[8]    In Sands, the court uses the clause "when the limitations period would normally have begun" to denote the commencement of the time period that is limited by the applicable statute of limitations. It does not refer to the commencement of the "bar" imposed by the statute.

The post-conviction court made numerous factual findings with respect to the agents' information about the crime. It found that within a day or two of the burglary and shooting in September, 1982, two separate individuals told Agents Merryman and Mann that Billy Hall was an alleged participant in the incident. The agents found the information to be credible and realistic; however, Merryman and Mann could not state with certainty that Mann had actually relayed this information to any other law enforcement agents although they believed that they had. The parties stipulated at the hearing that Agent Rex Owenby could not recall hearing this information prior to October, 1985. The information was memorialized in "302" forms after the second interviews in November and December of 1985. O'Rear notified the Knox County District Attorney General on January 9, 1986. The memorandum does not recite the exact date that the petitioners learned of the statements of Allen and McClanahan. It simply states that "[u]pon receipt . . . defense counsel for Mr. Hutchison and Mr. Harper were notified of this information."

The record on appeal indicates that Hutchison's attorney learned around September 1, 1986 that the F.B.I. had passed some exculpatory information to the District Attorney General. Ray Shirley, Harper's attorney, certainly knew of the information in late 1987 when he filed a Motion to Reopen based on the existence of the "302" forms.[9] The limitations period did not begin to run until October 19, 1987, the date permission to review the direct appeal was denied by our supreme court. Therefore, the existence of the "302" forms and the information contained in them may be viewed as later-arising grounds, indulging for Harper's sake the assumption that his attorney did not receive the information prior to October 19, 1987 (even though Hutchison was actively involved in investigating the information in the fall of 1986). Harper filed a motion to re-open, and upon a hearing

---

[9] The record does not include the exact date of filing, but the motion was filed either in late 1987 or early 1988. Harper's motion was denied prior to the denial of Hutchison's motion on June 26, 1989.

the motion was denied on June 26, 1989. Even if we further indulge Harper and not charge him with the relevant knowledge about Allen until June 26, 1989, his post-conviction claim on this issue is barred. Certainly, the <u>Sands</u> dispensation is not infinitely open-ended. See <u>O'Donnell v. State</u>, 905 S.W. 2d 951, 953 (Tenn. Crim. App. 1993). Harper is afforded a reasonable opportunity to present his claim if the <u>Sands</u> remedial limitations period of these years commenced no later than June 26, 1989. <u>O'Donnell</u>, 905 S.W.2d at 953. Even under this liberal view of the facts the post-conviction claim became barred on June 26, 1992, some seven months prior to the filing of Harper's petition on January 21, 1993. Pursuant to the analysis prescribed in <u>Sands</u>, <u>Burford</u> provides Harper with no effective relief from the statute of limitations with respect to the information obtained by Agents Merryman and Mann. Our consideration of this alleged <u>Brady</u> violation is barred by the statute of limitations.[10] However, as discussed in Part II below, even if Harper had timely filed his petition, he would have been entitled to no relief on this the first <u>Brady</u> issue.

The alleged exculpatory information on the second <u>Brady</u> issue, the information found in the reports prepared by the F.B.I. laboratory, presents a different problem. The evidence in the record is contradictory and inconclusive, and the post-conviction court made no findings of fact from which we can determine when these grounds arose. Factual issues raised by the evidence must be resolved by the trial court. <u>Black v. State</u>, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Therefore, upon remand, the post-conviction court must determine whether these grounds are truly later arising and whether a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present his claim about the F.B.I. lab report. <u>Sands</u>, 903 S.W.2d at 301.

## II. Hutchison's <u>Brady</u> Issues

---

[10] This ruling, of course, does not apply to Hutchison's petitions which he filed in 1988 and 1989, well before the 1990 deadline.

At the post-conviction hearing, Hutchison argued that the state failed to provide him with exculpatory information (1) possessed by F.B.I. agents and (2) contained within the F.B.I. laboratory results in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963). In Brady, the United States Supreme Court held that the prosecution has a compelling duty to furnish the accused with exculpatory evidence pertaining either to the accused's guilt or innocence or to the potential punishment that may be imposed and that "suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87; 83 S.Ct. at 1196-97. See also Branch v. State, 4 Tenn. Crim. App. 164, 469 S.W.2d 533 (Tenn. Crim. App. 1969). The duty to disclose arises when (1) the evidence is material; (2) the evidence is favorable to the accused, his defense, or the sentence that will be imposed if found guilty; (3) the state suppressed the evidence; (4) the accused has made a proper request for the production of the evidence, unless the evidence, when viewed by the prosecution, is obviously exculpatory in nature and will be helpful to the accused. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375 91985); State v. Spurlock, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993).

The duty to disclose extends to all information favorable to the accused whether the evidence is admissible or inadmissible. State v. Spurlock, 874 S.W.2d at 609; Branch v. State, 4 Tenn. Crim. App. at 164; 469 S.W.2d at 534. Evidence that would be useful to impeach a witness must also be disclosed. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763 (1972). Although Brady does not require the state to investigate for the defendant, it does burden the prosecution with the responsibility of disclosing statements favorable to the defense. State v. Reynolds, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984); State v. Goodman, 643 S.W.2d 375, 379-80 (Tenn. Crim. App. 1982). This responsibility extends not only to material in the prosecutor's immediate custody but also to statements in the possession of the police that the prosecutor may obtain by the exercise of due

diligence. State v. Hicks, 618 S.W.2d 510, 514 (Tenn. Crim. App. 1981). Due diligence has been defined as consisting of requesting information from all officers participating in the investigation or preparation of the case. Id. The duty does not extend to information that the defense already possesses or is able to obtain, or to information not in the possession or control of the prosecution. Banks v. States, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977).

With these standards in mind, we address the two Brady issues separately below.

**A. Exculpatory information possessed by F.B.I. agents**

In post-conviction proceedings, the petitioner has the burden of proving the grounds raised in the petition by a preponderance of the evidence. Clark v. State, 800 S.W.2d 500, 506 (Tenn. Crim. App. 1990). The findings of fact made by the trial court at the conclusion of a hearing on a petition for post-conviction relief has the weight of a jury verdict. Clark v. State, 800 S.W.2d at 506. In this instance, the post-conviction judge found that, although there was no evidence of bad faith on the part of any law enforcement agency or member, Brady requires that the information in the possession of the F.B.I. should have been made available to the defense and could very well have altered the outcome if it had been supplied. The state argues that the prosecution cannot be required to turn over information of which it is unaware and which is in the sole possession and control of a federal agency. We agree that the state cannot be held accountable for information in the hands of a federal agency as long as the state had no knowledge of the information's existence and the federal agency was not involved in the investigation or preparation of the case.

In this case, the court found that, within a day or two of the burglary and shooting in 1982, agents of the Federal Bureau of Investigation received information from two separate individuals indicating that someone other than

**13**

Leonard Hutchison had shot James David Comer. The information contained significant details such as descriptions of the vehicles and the weapon and statements of how the incident developed and concluded. The agents believed that they had passed it along to Agent Rex Owenby who had contacts within the Knoxville Police Department. However, no one involved could state positively that the information had been forwarded to the local authorities. The agents formally documented this information after interviewing the individuals a second time in November and December, 1985. Agent Richard O'Rear informed the Knox County District Attorney General's office in January, 1986. The post-conviction court's memorandum also states that no law enforcement agency or any member of the prosecution intentionally withheld the evidence and that the evidence was inadvertently suppressed until 1986. Hutchison was convicted in August, 1985.

The post-conviction court then concluded that the evidence was exculpatory and material in that a reasonable probability existed that had the evidence been disclosed to the accused, the result of the proceedings would have been different. Based on these findings, the judge granted Hutchison's petition for relief. Although the record supports the lower court's factual findings and the conclusion that the information was both exculpatory and material, we cannot agree that, on these facts, the prosecutor had a duty to disclose information in the possession and control of the F.B.I. agents.

Hutchison contends correctly that when the state uses the facilities of the F.B.I. laboratory for various scientific tests, the F.B.I. is considered an agent of the State of Tennessee for the purposes of Rule 16 (a)(1)(D), Tennessee Rules of Criminal Procedure. State v. Goodman, 643 S.W.2d 375, 379 (Tenn. Crim. App. 1982); David Palmer v. State, No. 03C01-9303-CR-00079, slip op. at 3 (Tenn. Crim. App., Knoxville, May 20, 1994). However, we do not find that the result in Goodman is applicable to the "302" forms in this case. Rule 16(a)(1)(D) requires the state to allow the defendant to inspect and copy the results or reports of physical or mental

**14**

examinations, scientific testing or experiments. Tenn. R. Crim. P. 16(a)(1)(D). In both Goodman and Palmer, the reports in question were those generated by the F.B.I. laboratory and were of the kind specifically mentioned in Rule 16. In this instance, the information was neither produced by nor in the possession of the F.B.I. laboratory, and the information did not involve scientific testing or test results.

Hutchison also mistakenly relies on United States v. Minsk, 963 F.2d. 870 (6th Cir.), for the proposition that the refusal to disclose the information in "302" forms violates Brady. However, Minsk involved violations of federal law, and the F.B.I. undoubtedly was involved in the investigation and preparation of the case. Moreover, the "302" forms were prepared prior to trial. In the present case, the F.B.I. had no investigative responsibility and no documentation existed at all until three months after trial. No amount of diligent searching could have uncovered the non-existent forms.

In Tennessee, a prosecutor's duty to disclose extends not only to material in his or her immediate custody, but also to statements in the possession of the police that are normally obtainable by the exercise of due diligence. State v. Hicks, 618 S.W.2d 510, 514 (Tenn. Crim. App. 1981). Due diligence is generally fulfilled by a request to all officers participating in the investigation or preparation of the case. Id. The two agents who had the information were conducting an independent federal investigation. Although the F.B.I. laboratory tested materials for the Knoxville Police Department, a request to the laboratory could not have uncovered the knowledge possessed only by the undercover agents.

The state must disclose any information that it knew or should have known is favorable and material to the defense. State v. Craig Allen Lewis, No. 01C01-9307-CC-00232, slip op. at 26 (Tenn. Crim. App., Nashville, Jan. 12, 1995). The post-conviction judge found that the District Attorney General first learned of McClanahan and Allen's statements in January, 1986. The record supports this

**15**

finding. Nothing indicates that either the police officers who investigated this incident or the prosecutors who tried the case had any knowledge of an independent F.B.I. investigation into car theft activity in East Tennessee. In short, the state had no reason to think that any F.B.I. agent might have information that was potentially material and exculpatory to Hutchison's defense. Moreover, even if the prosecutor had requested copies of any "302" forms relating to the incident, none would have been forthcoming because they were not created until after the trial was complete. Despite the fact that two F.B.I. agents possessed information that may have changed the outcome of the trial, we must conclude that the state did not violate the rule of Brady v. Maryland in this case. To hold otherwise would require the state to make endless inquiries from every agency, state or federal, that might conceivably have information relating to local criminal investigations.

We recognize and share the concern of the post-conviction judge that justice be done. We are puzzled by the nine-month delay between O'Rear's letter to the district attorney general and the notification provided to Hutchison's attorney. However, as an intermediate appellate court, we can only respond to the issues that are raised. On these facts, the state did not violate the dictates of Brady v. Maryland by failing to produce McClanahan's and Allen's "302" forms in response to the defendants' discovery request.[11]

**B. Suppression of the F.B.I. laboratory reports**

---

[11] We note in passing that at the second trial, Hutchison had Hall and McClanahan available as witnesses. Apparently, the plan was to offer Hall as a witness that he (Hall) fired the shots at the victim and then, if Hall denied this scenario, to offer McClanahan's testimony in order to insert into evidence Hall's prior extra-judicial admissions. This plan was thwarted when McClanahan disappeared before Hall could be called, and for this reason Hall was not called. Harper's attorney knew of the planned testimony. The only aspect of the Hall scenario that was unknown at the time of trial was the alleged information possessed by Paul Allen that implicated Hall. However, Allen never testified at any proceeding in this cause and, significantly, did not testify at the post-conviction hearing.

As their second Brady issue, Hutchison and Harper contend that they are entitled to a new trial based upon the state's failure to disclose exculpatory F.B.I. laboratory reports. The record contains a considerable amount of testimony and evidence that was presented at the hearing. However, there are factual issues in dispute about which the evidence is contradictory and inconclusive.[12] Since the trial court's ruling was based upon the first Brady issue, the trial court made no

---

[12] For instance, the prosecution argued that the motion to continue filed by Don Coffey, Harper's attorney at the first trial, indicates that the defense had the results long before the first trial. The language of the motion is ambiguous because it states that "only today, February 3, 1984, was the affiant advised that scientific tests have been conducted by the F.B.I., the results of which will necessitate further testing by the defendants. . ." Similarly, the prosecution contended that an exchange at the first trial between Coffey and the prosecutor shows that Coffey held the report in his hand for a brief moment during the cross-examination of Arthur Bohanan, a police officer, on the subject of the victim's hand swabs.

Coffey: And the report came back inconclusive?
Bohanan: Yes, sir.
Coffey: Does that mean that he could have shot, or that he could not have shot? It could have been either way?
Bohanan: Well, in a test of that type -- I have the report here, if you would like it.
Coffey: If I might see it? Is this from the FBI lab?
Bohanan: This is from the FBI lab. yes, sir.
Coffey: Would you read that relevant part of the report to the jury, Mr. Bohanan?

On the other hand, Doug Trant and Ray Shirley, counsel for the defense at the second trial, both testified that they found no copies of the report either in the court file or in the files provided by the prior attorneys. Hutchison testified that he first saw a copy of one report when he received some documents through the Freedom of Information Act in 1989. He finally received copies of all three reports in either late 1991 or early 1992. In addition, the petitioners allege that actual lab results show that at least two of the state's witnesses gave false testimony.

factual findings concerning this second <u>Brady</u> issue or the issue of ineffective assistance of counsel. Factual issues raised by the evidence must be resolved by the trial court and then included in appropriate findings of fact. <u>George Tate v. State</u>, No. 02C01-9108-CR-00170, slip op. at 6 (Tenn. Crim. App., Jackson, May 20, 1992) . It is the duty of the trial court to weigh and evaluate the evidence, to resolve conflicts in the testimony, and to determine the credibility of the witnesses. <u>Black v. State</u>, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). It is inappropriate for this court to determine contested factual issues from the printed record. <u>Johnny Eugene Johnson v. State</u>, No. 01C01-9508-CC-00247, slip op. at 3 (Tenn. Crim. App., Nashville, Oct. 10, 1996), <u>perm. app. denied</u> (Tenn. 1997).

The petitioners claim that the prosecution did not provide the F.B.I. reports despite their motions for discovery.[13] The state contends that the petitioners had these reports prior to the first trial. The trial court and not this court must resolve the conflicting evidence, determine whether the state withheld the reports, and when the defense actually received copies of them. At that point, the trial court will be able to determine whether Harper's post-conviction petition meets the criteria set forth in <u>Sands v. State</u>, 903 S.W.2d 297 (Tenn. 1995). With respect to Hutchison's petitions, the trial court should also make findings resolving Hutchison's claim of ineffective assistance of counsel. Based on these findings, the post-conviction court may then determine whether to grant or deny the petitions for relief.

We reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

_____
CURWOOD WITT, Judge

_____

[13]        The reports were not introduced at either trial. At the second trial the parties stipulated that the results of the tests were inconclusive. Defense counsel testified that they relied upon the statements of the assistant district attorney and never saw copies of the reports. The assistant district attorney, who was not involved in the first trial, said he assumed that defense counsel had copies in their possession.

CONCUR:


_____
JOSEPH M. TIPTON, Judge


_____
WILLIAM M. BARKER, Judge