# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### June 2000 Session

## STATE OF TENNESSEE v. JOHN WAYNE GRAY

**Appeal from the Circuit Court for Franklin County**
**No. 12,175      Buddy D. Perry, Judge**

---

**No. M1999-01615-CCA-R3-CD  - Filed July 28, 2000**

---

The Defendant, John Wayne Gray, appeals as of right from his conviction of the sale of a schedule II controlled substance. On appeal, he argues (1) that the trial court erred by failing to grant his motion for acquittal or directed verdict because the State failed to establish circumstances and facts that would provide for a reasonable assurance of the identity of the evidence and because the State failed to establish an unbroken chain of custody; (2) that the evidence was insufficient as a matter of law to support the jury verdict; and (3) that the trial court erred in sentencing the Defendant to a mid-range sentence as a Range III offender. We find no error. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed.**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH, J., and JOHN EVERETT WILLIAMS, J., joined.

Francis Pryor, Jasper, Tennessee, Cynthia Driver; Assistant Public Defender, Jasper, Tennessee, for the appellant, John Wayne Gray.

Paul G. Summers, Attorney General and Reporter; Marvin E. Clements, Jr., Assistant Attorney General; J. Michael Taylor, District Attorney General; Steven M. Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In this appeal as of right, the Defendant, John Wayne Gray, challenges his conviction of the sale of a schedule II controlled substance and the sentence imposed by the trial court. After a jury trial, the Defendant was found guilty of both the sale and delivery of cocaine base, a schedule II controlled substance. Those convictions were merged into a single conviction of the sale of a schedule II controlled substance. After a sentencing hearing, the trial court found the Defendant to be a Range III persistent offender and sentenced the Defendant to thirteen years incarceration, which was a sentence in the middle of the range. On appeal, the Defendant raises the following three issues: (1) whether the trial court erred by failing to grant the Defendant's motion for acquittal or

directed verdict because the State failed to establish circumstances and facts that would provide for a reasonable assurance of the identity of the evidence and because the State failed to establish an unbroken chain of custody; (2) whether the evidence was sufficient to support the verdict; and (3) whether the trial court erred in sentencing the Defendant to a mid-range sentence as a Range III offender. We affirm the judgment of the trial court.

The evidence at trial established that in April 1998 Sergeant Danny Mantooth of the Winchester Police Department was involved in undercover operations for drug enforcement targeting street level crack cocaine dealers. On April 8, 1998, Sgt. Mantooth enlisted the assistance of Investigator Herb Glassmyer and Captain Joyce McConnell, both of the Lincoln County Sheriff's Department, in making undercover drug buys. Sgt. Mantooth provided Glassmyer and McConnell with "buy money" and a vehicle equipped with a tape recorder and a hidden video camera. Glassmyer and McConnell made three drug buys that day. The Defendant was involved in the second drug buy.

Sgt. Mantooth testified that he met with Glassmyer and McConnell after they made the first buy, and then he met with them again after they made the second and third drug buys. During the second meeting, Glassmyer gave him two plastic bags, one of which contained an off-white rock-type substance, a small piece of cellophane or plastic, and a small piece of paper with the number "2" on it. When Sgt. Mantooth received the bag, he initialed it at the corner and wrote the date on it. The officers then reviewed the videotape made with the hidden camera. When they observed the second buy on the videotape, Sgt. Mantooth recognized the person selling the substance as the Defendant. Glassmyer indicated that he purchased the substance in the bag containing the number "2" during the second buy. Sgt. Mantooth then wrote "John Wayne Gray" and the number "9804081403" on the bag. That number identifies the date as April 8, 1998 and the time of day as 1403, or 2:03 p.m. Sgt. Mantooth removed the small piece of paper with the number "2" on it that was in the bag. He also sealed the bag with evidence tape.

Sgt. Mantooth testified that after labeling the plastic bag with the Defendant's name and the case number and sealing it, he took the bag to the police department and locked it in a fireproof filing cabinet, to which only he had a key. Before locking it in the cabinet, he stapled to the bag a form requesting that the substance be examined by the Tennessee Bureau of Investigation (TBI) crime laboratory. On April 13, 1998, Sgt. Mantooth delivered the bag to Sergeant John Stewart, the evidence custodian, for Sgt. Stewart to deliver to the crime laboratory.

Investigator Herb Glassmyer testified that on April 8, 1998, he was working undercover with Captain McConnell for the Winchester Police Department. The two officers were instructed to attempt to purchase crack cocaine in certain areas of Winchester. They were furnished a tape recorder and video camera by the Winchester Police Department. Three purchases were made that day. The second purchase was from the Defendant, John Wayne Gray. With Captain McConnell driving, the two officers drove through the targeted area. Investigator Glassmyer held out a $20 bill, and the Defendant started walking toward their vehicle. Investigator Glassmyer told Captain McConnell to "back up," which she did. The Defendant approached the vehicle and pulled out a tube on a chain from inside his shirt. He dumped the contents of the tube into his hand for Captain

McConnell to choose what she wanted. Captain McConnell made a selection and handed the Defendant the money. She then started to unwrap the "rock," which was wrapped in plastic, to inspect it. Investigator Glassmyer told the Defendant that they wanted to inspect it because they had been sold "wax" before. The Defendant replied that "he didn't do like that." After the transaction, Investigator Glassmyer placed the "rock" and the plastic in which it had been wrapped into a plastic "baggy," and he then put a piece of paper with the number "2" on it in the bag because this was the second purchase that day.

After making the third buy that day, Investigator Glassmyer and Captain McConnell met with Sgt. Mantooth and turned over to Sgt. Mantooth the evidence that they had collected. They then watched the videotapes from the transactions. Sgt. Mantooth was able to provide a name to go with the person who sold Investigator Glassmyer and Captain McConnell the "rock" labeled "2." The officers discussed that the Defendant was the person who sold the substance in the bag with the piece of paper that said "2." Although Investigator Glassmyer did not personally know the Defendant, he testified during the trial that the Defendant was the person who sold him the "rock." The videotape of the second drug purchase was played for the jury.

Sergeant John Stewart testified that he is in charge of evidence control for the Winchester Police Department. He said that he brought to court a brown manila envelope which contained the plastic package that had been sent to the crime lab for analysis. Sgt. Stewart testified that on April 13, 1998, Sgt. Mantooth personally gave him a plastic package to send to the crime lab. At the top of the analysis request form, which was stapled to the plastic package, Sgt. Stewart wrote the date and the time he received the package. The form contained the case number, which was 9804081403. The package was sealed when Sgt. Stewart received it. He said that he will not accept packages that are not already sealed with evidence tape. Sgt. Stewart locked the package in his "secure room" until the next day, when he shipped it to the TBI crime lab.

Sgt. Stewart testified that when he ships an item to the TBI, he takes the package, which has the TBI request form stapled to it, puts it in a manila envelope, seals the manila envelope, and places it into a square cardboard box. He puts the packages in manila envelopes to keep the cases separate before he puts them in the box. He said that there may be two or three different packages in the box, each marked with a different case number. Sgt. Stewart then seals the box with tape and takes it to the Herald Chronicle, which is the local distribution agent for United Parcel Service (UPS). The person at the Herald Chronicle signs for the box and puts a control number on it. Sgt. Stewart is given the control number, and the box is shipped to the TBI crime lab by UPS. This is the procedure Sgt. Stewart followed when he shipped case number 9804081403 to the crime lab by UPS on April 14, 1998. Although Sgt. Stewart did not know how many pieces of evidence he shipped to the TBI in the same box on April 14, 1998, he said that there could have been "several" items in the box. The control number Sgt. Stewart received for the box was 1Z3197160310023765. On November 4, 1998, Sgt. Stewart personally went to the crime lab and retrieved the manila envelope containing the plastic package with suspected drugs inside. Sgt. Stewart took the package back to the police department and locked it in his secure room until he removed it for court. He said that no one other than himself had access to the package and that neither he nor anyone else had tampered with the package. It was sealed, just like it was when he retrieved it from the TBI.

-3-

Patricia Pickett testified that she works for the Herald Chronicle and that as part of her job she receives packages to be shipped by UPS. On April 14, 1998, Sgt. Stewart brought in a box that he wanted shipped to the TBI crime laboratory in Chattanooga, Tennessee. Ms. Pickett received the box and assigned it a tracking number, number 1Z31971603100023765. The tracking number was placed on the box. The box weighed six pounds. She said that the tracking number she assigned the package was the same number that appeared on the receipt she gave to Sgt. Stewart. Once she received the package, she placed it with the office supplies near her in the office. She testified that "[m]ost likely" no one other than herself could get to the package because it was kept behind the counter, and customers do not come behind the counter. Ms. Pickett received six packages that day, and she turned all six packages over to Lon Partin, the UPS employee who picks up the packages from her. Mr. Partin signed for all six packages, including the one received from Sgt. Stewart. UPS took possession of the package at 3:50 p.m. on April 14, 1998. Ms. Pickett said that it should only take one day for UPS to deliver a package to Chattanooga, and she had no explanation for why the package was not received until fourteen days later. She testified that she did not tamper with the box and that the box did not appear to have been tampered with while it was with her behind the counter.

Ms. Salena Darter testified that until shortly before the time of trial, she was a forensic scientist who tested substances for the presence of drugs and who performed blood alcohol analysis for the Tennessee Bureau of Investigation crime laboratory in Chattanooga, Tennessee. She tested the substance at issue in this case. She said that a "Request For Examination" form had been submitted by the Winchester Police Department, along with a substance to be tested. The package was received from UPS by Raymond Siler, her supervisor. Mr. Siler filled out the bottom part of the "Request for Examination" form when the package arrived, indicating that he received the package from UPS on April 28, 1998 at 4:00 p.m. The lab assigned the package the laboratory number 98301638. It was kept in the evidence vault, which is locked and has limited access, until it was retrieved for testing by Ms. Darter. At the time, six people had access to the evidence vault.

Ms. Darter testified that she retrieved the package from the evidence vault on July 23, 1998 and placed it into her personal storage until she analyzed it. The evidence was in an outer envelope. Ms. Darter testified that she "assumed" this was the original packaging because according to TBI policy, TBI employees do not change packaging unless it is absolutely necessary, and if they do, they make a note of it and keep the original packaging. She explained, "This evidence was probably brought in either in that envelope or it's possible that there was a box with several case [sic] in it and that one of those cases is still in that box." Ms. Darter labeled this outer envelope with the Defendant's name, the laboratory number, how it was received, the date it was received, and her initials. Inside the envelope was a small package, which she marked with a computer-generated label containing the laboratory number and her initials. Ms. Darter performed two tests on the substance in the inner package, a presumptive test and a confirmatory test. Ms. Darter identified the substance as 0.1 grams of cocaine base, which is commonly referred to as crack cocaine.

After she finished analyzing the substance, Ms. Darter put it back in its original packaging and sealed the outer manila envelope with red evidence tape that is tamper-proof. She initialed it, dated it, stapled it, and placed it into the evidence vault where it was stored until picked up by the

police department. She said that the package was kept in the vault until November 4, 1998, when it was retrieved by John Stewart.

Ms. Darter testified that the crime laboratory has a "very strict set of procedures," and that the employees "follow those in and out." She said that when she retrieved the package from the vault, there was no evidence that it had been tampered with. Had there been signs that the package had been tampered with when it arrived, there would have been a notation about it on the examination form.

## IDENTITY OF EVIDENCE

The Defendant first argues that the trial court erred by failing to grant the Defendant's motion for acquittal or directed verdict because the State failed to establish facts and circumstances that would reasonably assure the identity of the evidence or to establish an unbroken chain of custody. As a condition precedent to the introduction of tangible evidence, the State must either introduce a witness who is able to identify the evidence or establish an unbroken chain of custody of the evidence. State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982); Bolen v. State, 544 S.W.2d 918, 920 (Tenn. Crim. App. 1976). The requirement of proving an unbroken chain of custody before introducing such evidence is to demonstrate that there has been no tampering, loss, substitution, or mistake regarding the evidence. State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). However, the failure to call all of the witnesses who handled the evidence does not necessarily preclude its admission into evidence. See id. at 758-59; State v. Holloman, 835 S.W.2d 42, 46-47 (Tenn. Crim. App. 1992); State v. Johnson, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1982). The State is not required to establish facts which exclude every possibility of tampering, but the circumstances established must reasonably assure the identity of the evidence and its integrity. State v. Ferguson, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987). "Whether the requisite chain of possession has been sufficiently established to justify admission of the exhibit is a matter committed to the discretion of the trial judge and his determination will not be overturned in the absence of a clearly mistaken exercise thereof." Ritter v. State, 462 S.W.2d 247, 249 (Tenn. Crim. App. 1970).

In making his determination on the admissibility of the cocaine, the trial judge noted that there was no testimony from the UPS carriers who handled the package and that there was no testimony from Mr. Siler, the TBI employee who received the evidence from UPS. However, the judge also noted that evidence established that the package was sealed when it left Winchester and that it was still sealed when it arrived at the TBI. The judge then stated,

> [T]he issue for me would be is the chain of custody violated when you don't have the TBI agent on the other end that actually receipted the evidence and the various carriers along the way that delivered it for UPS and I'm finding that that's not void in the chain and it's integrity is still maintained, notwithstanding the absence of those witnesses.

We agree with the determination of the trial court. Investigator Glassmyer testified that he received a substance from the Defendant and that he placed that substance, along with the plastic it had been wrapped in, inside a plastic bag. He placed a piece of paper with the number "2" on it in the bag and gave the bag to Sgt. Mantooth. Sgt. Mantooth initialed and dated the bag when he received it, and after watching the videotape of the transaction with Investigator Glassmyer and Captain McConnell, he wrote the Defendant's name on the bag and discarded the paper with the number "2." Sgt. Mantooth stored the evidence in his locked filing cabinet, to which only he had the key. He filled out a lab examination request form and stapled it to the plastic bag. The then turned the evidence over to Sgt. Stewart, the evidence custodian. No one else had access to the evidence before he turned it over to Sgt. Stewart. Sgt. Stewart testified that received the evidence from Sgt. Mantooth and that he does not accept evidence that is not already sealed with evidence tape. He placed the evidence in his "secure room," where only he had access to it. He removed it the next day to ship it to the TBI via UPS. He testified that when he ships items to the TBI, he places each item in a manila envelope and then places the envelope in a cardboard box. He may ship several different envelopes with different case numbers in the same box. He did not know how many different envelopes he shipped to the TBI in the same box when he shipped this particular evidence. He did, however, know when he shipped this evidence. He put it in a box and took the box to the Herald Chronicle, which is the local UPS drop-off location, on April 14, 1998. He received a tracking number for the box and left it with Ms. Pickett. Ms. Pickett testified that she accepted the box from Sgt. Stewart, assigned the tracking number, and stored the box near her until she turned it over to UPS later that day. She said the box did not show signs of tampering. Ms. Darter then testified that the evidence was received by the TBI from UPS by her supervisor, Raymond Siler, on April 28, 1998. If the package had shown signs of tampering, they would have been noted. The evidence was in an envelope when she received it, not a box, but Ms. Darter explained that sometimes several envelopes come in the same box, and the box in which this evidence arrived could be with the evidence in a different case which arrived in the same box. The evidence was sealed. Ms. Darter tested the substance and found that it was cocaine base, or crack cocaine. She then placed the evidence back in its original packaging and sealed the outer manila envelope with evidence tape. She stored the package in a secure location until it was received by Sgt. Stewart. Sgt. Stewart testified that he personally retrieved the package from the TBI, and he stored it until he brought it to court for trial. The package did not show signs of tampering.

Based on this evidence, we conclude that the trial court did not abuse its discretion in ruling that the identity and integrity of the evidence had been sufficiently established. Although the UPS employees who handled the package did not testify, and Raymond Siler who received the package for the TBI did not testify, there was no evidence that the package had been tampered with between the time it left Ms. Pickett's possession when she turned it over to UPS and the time Ms. Darter retrieved the package for testing. The inner plastic package containing the evidence to be tested was still sealed with evidence tape. While the Defendant points out that it took two weeks for UPS to deliver the package to the TBI when it should have only taken a day, that time period does not establish that the package had been tampered with. The fact that the TBI did not produce the box in which the evidence had been shipped, most likely with several other packages of evidence, likewise does not show that the evidence had been tampered with. Of importance is the integrity of

the actual package in which the evidence was placed and sealed, and the evidence established that this package showed no signs of tampering.

The Defendant also relies on the unreported case of State v. Charles R. Cain and Roy Howard Rhea, Nos. 956, 957, 1992 WL 3008 (Tenn. Crim. App., Knoxville, Jan. 10, 1992), for the proposition that the State was required to call as witnesses the UPS employees before the evidence would be sufficient to establish the chain. That case does not, however, require the testimony of the UPS workers. In Cain, this Court found that the chain of custody was sufficiently established by the testimony of the witnesses, including certain UPS employees, even though the UPS employee who resorted the packages at a UPS hub before shipping them to their final destination did not testify. Id. at *11-12. We stated, "There is no evidence or indication from the record that these boxes had been in any way altered or tampered with after leaving El Paso until they came into the possession of Officer Boyd." Id. at *12. Similarly, there is no evidence in this record that the package had been tampered with since leaving Winchester until it came into the possession of Ms. Darter at the Tennessee Bureau of Investigation crime laboratory. Accordingly, we hold that the trial court did not abuse its discretion in admitting the evidence.

## SUFFICIENCY OF THE EVIDENCE

The Defendant next challenges the sufficiency of the evidence. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914.

In arguing that the evidence was insufficient, the Defendant reiterates his argument that the evidence establishing the identity and integrity of the cocaine tested by the TBI was insufficient. We have already determined that the identity and integrity of that evidence was sufficiently established and that the evidence was properly admitted. The evidence at trial also established that

the Defendant sold the crack cocaine to Investigator Glassmyer and Captain McConnell. The transaction was recorded on videotape, and the videotape was played to the jury. Investigator Glassmyer identified the Defendant as the person who sold him the crack cocaine. We conclude that the evidence was clearly sufficient to support the verdict. This issue has no merit.

SENTENCING

Finally, the Defendant argues that the trial court erred in sentencing him as a Range III persistent offender and in sentencing him to a mid-range sentence. When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. State v. Thomas, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988); Tenn. Code Ann. §§ 40-35-102, -103, -210.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The Defendant first asserts that the trial court erred in finding that he was a Range III persistent offender. For the Defendant to be sentenced as a persistent offender, the trial court was required to find beyond a reasonable doubt that the Defendant had five or more prior felony convictions. See Tenn. Code Ann. § 40-35-107(a)(1), (c). Based on the prior convictions listed in the presentence report and on the State's notice of intent to seek Range III sentencing, the trial court found that the Defendant was indeed a persistent offender. At the sentencing hearing, the Defendant did not challenge the validity of the prior convictions listed on the sentencing report or the use of those convictions to establish his sentencing range. Instead, the Defendant argued that he should be sentenced as a Range II offender because the State originally filed an intent to seek Range II sentencing. The Defendant admitted, however, that the intent to seek Range III sentencing was timely filed. See id. § 40-35-202(a). He raises the qualifications of the Defendant as a persistent offender for the first time on appeal. A party who participates in or invites error is not entitled to relief. Failure to make a contemporaneous objection waives consideration by this Court of the issue on appeal. See Tenn. R. App. P. 36(a); State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App.

1988). Nevertheless, we have considered the Defendant's argument, and we conclude that he was properly sentenced as a persistent offender.

The five felony convictions used to categorize the Defendant as a persistent offender were listed as follows:

(1) Case # 7338, E Felony, Theft, Franklin Co. Circuit Court, 1990.
(2) Case # 7565, C Felony, Drugs, Franklin Co. Circuit Court, 1990.
(3) Case # 7569, E Felony, Drugs, Franklin Co. Circuit Court, 1990.
(4) Case # 8068, D Felony, Drugs, Franklin Co. Circuit Court, 1992.
(5) Davidson Co. TN, convicted of Burglary, Larceny of an auto and sentenced to 3 yrs. (3/24/76).

However, the presentence report indicates that the dates of the event or arrest and the dates of conviction were the same for both case number 7565 and case number 7569, both of which were drug offenses. According to the Tennessee Code, convictions for multiple felonies committed as part of a single course of conduct within twenty-four hours constitute a single conviction for the purposes of determining prior convictions. See Tenn. Code Ann. § 40-35-107(b)(4). There was no evidence offered indicating whether these convictions were part of a single course of conduct committed within twenty-four hours, and the trial court made no findings on this issue. Because the State has the burden of proving the sentencing status of the Defendant, this Court has previously held that when no proof is offered as to whether certain convictions were part of a single course of conduct committed within twenty-four hours, the Defendant is entitled to the benefit of the doubt; accordingly, the convictions must be treated as a single conviction for the purpose of determining prior convictions. State v. Jones, 901 S.W.2d 393, 397 (Tenn. Crim. App. 1995); State v. Delbert G. Mosher, C.C.A. No. 01C01-9807-CC-00320, 1999 WL 820871, at *4 (Tenn. Crim. App., Nashville, Oct. 13, 1999).

Notwithstanding, the presentence report also lists a September 6, 1989 conviction of petit larceny in Franklin County Circuit Court, for which the Defendant was sentenced to two years. Under the conversion statute classifying pre-1989 offenses, petit larceny is a Class E felony. See Tenn. Code Ann. § 40-35-118. Therefore, the Defendant had the requisite number of prior convictions to properly classify him as a persistent offender. See id. § 40-35-107(a)(1).

The Defendant also argues that the trial court improperly determined the length of his sentence. He contends that the court failed to apply the mitigating factors that it found. As a Range III persistent offender, the sentence range for the Defendant for this Class C felony was ten to fifteen years. Id. § 40-35-112(c)(3). The presumptive sentence for a Class C felony is the minimum in the range if there are no enhancement or mitigating factors. Id. § 40-35-210(c). In setting the appropriate sentence, the trial court is to start at the minimum sentence, enhance the sentence within the range as appropriate due to the presence of enhancement factors, and then reduce the sentence as appropriate due to the presence of mitigating factors. Id. § 40-35-210(e).

Here, the trial court found the existence of the following three enhancement factors, which are not challenged by the Defendant:

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;[1]
. . .
(8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;[2]
. . . [and]
(21) The defendant, who was provided with court-appointed counsel, willfully failed to pay the administrative fee assessed pursuant to § 40-14-103(b)(1).

Id. § 40-35-114(1), (8), (21). The trial court gave great weight to factors (1) and (8), and it gave very little, if any, weight to factor (21). The trial court also gave "credence" to three of the four mitigating factors listed by the Defendant. Those mitigating factors were all non-statutory factors relating to the Defendant's attempts to provide for his family, the death of his baby and his resultant depression, and his low intelligence. See id. § 40-35-113(13). The court then stated,

[I]t's not a situation where you say there's three here two here or three here three here [and] they're equally balanced. You've got to give some rational weighing of the mitigating and enhancing [factors] and make a judgment as to what the appropriate sentence is. It's rather clear to me in this case that the enhancing factors significantly outweigh the mitigating factors that are listed.

The trial court accordingly set the sentence at thirteen years, which was a sentence in the middle of the range. We conclude that the trial court properly considered the enhancement and mitigating factors and then set a lawful sentence within the range. Accordingly, we must affirm the sentence set by the trial court.

The judgment of the trial court is affirmed.

---

[1] In addition to the felony convictions used to classify the Defendant as a persistent offender, the Defendant had numerous misdemeanor convictions.

[2] The presentence report reflects that the Defendant's community corrections sentence for larceny was revoked due to new criminal activity, and the Defendant was paroled three times while serving a seven-year sentence for the sale of cocaine and sale of marijuana, only to have his parole revoked each time within a matter of months.

_____

DAVID H. WELLES, JUDGE