# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 1, 2003

## STATE OF TENNESSEE v. MELVIN COFER

### Appeal from the Criminal Court for Hardeman County
### No. 6542     Jon Kerry Blackwood, Judge

---

### No. W2002-01984-CCA-R3-CD  - Filed July 25, 2003

---

The defendant, Melvin Cofer, was convicted of aggravated vehicular homicide, see Tenn. Code Ann. §§ 39-13-213, -218, and vehicular assault, see Tenn. Code Ann. § 39-13-106. The trial court imposed  Range I, concurrent sentences of twenty-one years and three years, respectively. In this appeal, the defendant asserts (1) that the trial court erred by refusing to suppress the results of the blood alcohol test; (2) that the trial court erred by limiting defense counsel's questioning of potential jurors; (3) that the evidence is insufficient to support the aggravated vehicular homicide conviction; (4) that the trial court erred by refusing to qualify a defense witness as an expert; (5) that the state failed to establish a proper chain of custody prior to the admission of the results of the blood alcohol test; and (6) that the trial court erred by denying his request for special jury instructions. The judgments of the trial court are affirmed.

### Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Harriet S. Thompson, Bolivar, Tennessee, for the appellant, Melvin Cofer.

Paul G. Summers, Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; and James Walter Freeland and Ryan Brown, Assistant District Attorneys General, for the appellee, the State of Tennessee.

### OPINION

At approximately 2:15 a.m. on March 12, 2001, Trooper Tim Scott was dispatched to the scene of a single-vehicle accident on Carlins Road in Hardeman County. When he arrived some thirty-five minutes after the accident, he observed that emergency medical personnel were preparing

to transport the female victim, later identified as Candice[1] Main, by helicopter to a hospital in Jackson. The male victim, Jeff Taylor, was being transported by ambulance to Jackson General Hospital. A green Honda lay upside down on the edge of the roadway. According to Trooper Scott, the vehicle had "crossed over the center line, and the center of the roadway, and had rolled over into oncoming traffic." The defendant, who was the owner of the Honda, acknowledged that he had been driving when the accident occurred. Trooper Scott described the defendant's speech as slurred, his eyes as watery, and his gait as unsteady, and observed that one of his pupils was dilated. Trooper Scott also smelled alcohol on his breath. There was an unopened can of beer beside the defendant's vehicle.

After photographing the vehicle, Trooper Scott questioned the defendant, who admitted that he had been drinking earlier in the evening and had taken Xanax, and then placed him under arrest for DUI. The officer transported the defendant to Bolivar General Hospital for a blood alcohol test, which the defendant refused. Because of injuries he suffered in the accident, the defendant was hospitalized and was later taken to Jackson General Hospital. Trooper Scott was not present when the defendant's blood was drawn. It was his opinion that the defendant was intoxicated when the accident occurred.

Trooper Scott, who had only three months' experience at the time of the accident, had previously investigated approximately twenty accidents. This was the first accident he had investigated which involved a fatality. Trooper Scott conceded that he did not interview any of the bystanders who were at the scene that night and acknowledged that the defendant's slurred speech, watery eyes, dilated pupil, and unsteady gait could have been caused by injuries he received in the accident.

Denise Walder, the victim Taylor's fianceé, testified that she had last seen him at approximately midnight on the night of accident and did not see him again until he was taken to the hospital. Upon her arrival at the hospital, she learned that Taylor had been in a car accident and had died.

Candice Main, who had attended a cookout at a neighbor's house on the day before the accident, testified that both the defendant and Taylor were there. Both were drinking. During the course of the evening, Ms. Main and Taylor decided to persuade the defendant to leave the cookout in order to avoid an altercation. She recalled that when they left in the defendant's car, each of them was drinking beer. According to Ms. Main, Taylor drove initially but the defendant eventually took the wheel. When the defendant began driving at an excessive rate of speed and swerving, she "begged [the defendant] to stop or let us out, or let somebody else drive." Ms. Main testified that she was pinned underneath the car when the defendant crashed. She recalled hearing Taylor talking but could not see him. The defendant ran for help. Just after a man and a woman pulled her from the car, she lost consciousness.

---

[1] The witness' name is also spelled "Candace" in other portions of the record. The spelling in the indictment is "Candice."

Ms. Main remained in the hospital for three weeks with injuries to her colon, pancreas and kidneys. All of her ribs were broken. She testified that "[i]t's not all [the defendant's] fault. He didn't want me to get in that car. . . . I believe the pain [the defendant has] been through is enough."

Laura Kitchen, a medical laboratory technician at Bolivar General Hospital at the time of the accident, testified that the defendant's blood was drawn at the direction of the emergency room physician to test for blood alcohol content. Although she could not specifically recall taking the defendant's blood, Ms. Kitchen testified that it is her practice to clean the area with water rather than alcohol before drawing the sample. Testing established that the defendant's blood alcohol content was .217 milligrams per deciliter.

Robert Marshall, a forensic scientist with the Tennessee Bureau of Investigation testified that the defendant's medical records established that a serum blood alcohol test, rather than a whole blood alcohol test, was performed. Using a standard formula, Marshall determined that the defendant's whole blood alcohol level would have been .177 percent. Marshall testified that while alcohol in the body generally dissipates at a rate of .01 to .02 grams percent per hour, the alcohol content of blood kept in a sealed container would likely remain the same. The defendant's medical records indicated that he had taken the prescription medication Xanax, which, according to Marshall, should not be combined with alcohol. Marshall testified that the medical records established that the defendant refused blood alcohol testing by law enforcement and that the testing was conducted for medical purposes.

Billy Irvin, a volunteer with the rescue squad that responded to the accident, testified that while he is not a certified emergency medical technician, he was certified to render medical assistance at accident scenes with few limitations. Irvin, who arrived at the accident scene at 2:20 a.m., testified that it took approximately twenty minutes to extricate Taylor, who was pinned between the ground and the rear window, with the full weight of the vehicle on his back.

Mechanic Roger Province, who examined the vehicle several months after the accident, determined that "the right rear tire was flat. The right rear wheel is turned under, and . . . the left front fender and the left front wheel has damage where it hit the tree." Province stated that he observed asphalt inside the rim of the right rear tire, indicating that it had dug into the roadway. He found that the tire had broken loose from the rim and the right rear suspension of the car was bent.

John Weaver, a paramedic with the Hardeman County Ambulance Service, testified that when he arrived at the scene of the accident, a number of bystanders were rocking the car in an attempt to lift it off of Taylor. According to Weaver, Taylor was lying on his stomach and was pinned under the car from his waist down. After directing the bystanders to step away from the vehicle, Weaver performed an assessment of Taylor's condition. Weaver noted that Taylor, who was conscious and able to speak, had a strong odor of alcohol on his breath. Initially, he did not detect any life-threatening injuries. After Taylor was removed from the vehicle, Weaver observed that "[i]n the lumbar area over the kidneys[,] which would be just above his belt line, there were two indent[a]tions in the back of the skin. They were approximately half an inch deep, guessing probably

the size of a cigarette, one over each kidney." Although Taylor's skin was not broken, it was Weaver's opinion that the injuries were of a type that "could cause a lot of damage to the internal organs."

Although a helicopter was called to transport Taylor to Jackson General Hospital or to The Med in Memphis, a major weather front between Hardeman and Shelby Counties prevented air travel so that only one helicopter was available. When the helicopter arrived, Taylor was pinned under the vehicle and Ms. Main's condition had worsened so the decision was made to transport Ms. Main by air and Taylor by ambulance. Although the pilot of the helicopter agreed to return and meet the ambulance after dropping off Ms. Main, weather conditions would not permit him to do so. Taylor's condition deteriorated during the trip to Jackson General Hospital, which took approximately an hour.

I

The defendant first asserts that the trial court erred by refusing to suppress the results of the blood alcohol test. He claims that because he was unconscious and because no exigent circumstances existed, his blood was drawn in contravention of Tennessee Code Annotated section 55-10-406(b). The state submits that the defendant has waived the issue by failing to include in the record the transcript of the hearing on the motion to suppress or the trial court's order denying the motion. In the alternative, the state asserts that the results of the blood alcohol test were admissible because the test was not performed at the direction of law enforcement, but for the purposes of medical diagnosis or treatment.

Generally, the failure to include the transcript of a suppression hearing constitutes a waiver of the issue. See Tenn. R. App. P. 24(b); Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). When no transcript is included in the record, this court must presume that the ruling of the trial court is correct. See State v. Taylor, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983).

The merits of the question are primarily governed by Tennessee Code Annotated section 55-10-406, which provides, in relevant part, as follows:

(a)(1) Any person who drives any motor vehicle in the state is deemed to have given consent to a test for the purpose of determining the alcoholic or drug content of that person's blood; provided, that such test is administered at the direction of a law enforcement officer having reasonable grounds to believe such person was driving while under the influence of an intoxicant or drug . . . .

*     *     *

(b) Any person who is unconscious as a result of an accident or unconscious at the time of arrest or apprehension or otherwise in a condition rendering that person incapable of refusal, shall be subjected to the test as provided for by §§ 55-10-405-55-10-412, but the results thereof shall not be used in evidence against that person in any court or before any regulatory body without the consent of the person so tested.

*           *          *

> (e) Nothing in this section shall affect the admissibility in evidence, in criminal prosecutions for aggravated assault or homicide by the use of a motor vehicle only, of any chemical analysis of the alcoholic or drug content of the defendant's blood which has been obtained by any means lawful without regard to the provisions of this section.

Tenn. Code Ann. § 55-10-406(a)(1), (b), (e).

This court has consistently held that section 55-10-406 does not apply to blood samples drawn pursuant to a medical request and analyzed by hospital personnel. See State v. Ridge, 667 S.W.2d 502, 505 (Tenn. Crim. App. 1982); see also State v. William Roy Hopper, No. 02C01-9612-CC-00485 (Tenn. Crim. App., at Jackson, Jan. 20, 1998); State v. Robert J. Kellet, No. 03C01-9401-CR-00002 (Tenn. Crim. App., at Knoxville, Jan. 27, 1995). Because the evidence in this case established that the defendant's blood was drawn pursuant to a medical rather than law enforcement request, Tennessee Code Annotated section 55-10-406 would not bar admission of the blood alcohol test results. In our view, the trial court did not err by refusing to suppress the results of the blood alcohol test.

II

The defendant next contends that the trial court committed reversible error by limiting questioning of potential jurors by defense counsel. He argues that counsel should have been permitted to explain the presumption of innocence utilizing "a metaphor based on the baptism of Jesus in the Jordan River and the white dove surrounding Jesus in the same manner that a cloak of innocence surrounds the accused." Our supreme court has held that "[t]he ultimate goal of voir dire is to see that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993).

Here, the trial court did not make a ruling which limited voir dire. To the contrary, the record establishes that defense counsel did not actually attempt to question jurors using the metaphor of the baptism. Prior to voir dire, the following colloquy took place:

> Prosecutor:        Your Honor, it has occurred to me that in the last DUI trial I had with [defense counsel], there was an allusion made to Jesus' baptism at the - -
> Defense Counsel:    I have no plan to do that.
> Prosecutor:        Thank you. That's what I was going to ask.
> Defense Counsel:    I'm going to tell a story about trees today.
> The Court:        All right.

It is our view that the defendant is not entitled to relief on this issue.

-5-

III

The defendant asserts that the evidence is insufficient to support the conviction for aggravated vehicular homicide. Specifically, he contends that the state overlooked its obligation to prove that Taylor had, in fact, died and also failed to establish that the car accident was the cause of his death. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

"Vehicular homicide is the reckless killing of another by the operation of an automobile . . . [a]s the proximate result of the driver's intoxication as set forth in § 55-10-401." Tenn. Code Ann. § 39-13-213(a)(2). "Aggravated vehicular homicide is vehicular homicide, as defined in § 39-13-213 (a)(2), where . . . [t]he defendant has two (2) or more prior convictions for . . .[d]riving under the influence of an intoxicant." Tenn. Code Ann. § 39-13-218(a)(1)(A).

Here, Taylor's death was established by the testimony of Denise Walder and by the admission of his death certificate into evidence. Trooper Scott testified that the roadway was dry and the weather clear when the accident occurred. Ms. Main testified that the defendant was driving erratically just prior to the accident and that he had been drinking. Taylor's medical records establish that he died from internal bleeding caused by injuries to his kidneys. Paramedic Weaver testified that he observed two indentations in Taylor's back just after the accident. Although the defendant introduced evidence suggesting that Taylor's injuries were either caused or exacerbated by the bystander's attempts to free him from the vehicle and that Taylor might not have died had he been transported by helicopter to a hospital with a higher trauma rating, it is well settled that the jury may reject the theory offered by the defendant and accredit the evidence offered by the state. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). In our view, the evidence is sufficient to support the conviction for aggravated vehicular assault.

IV

The defendant claims that the trial court erred by refusing to permit defense witness Roger Province to testify as an expert and render an opinion as to the cause of the accident. The state submits that the trial court properly refused to recognize Province as an expert because he did not have any scientific knowledge or specialized training in accident reconstruction.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. McDaniel v. CSX Transp., Inc., 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. "To give expert testimony, one must be particularly skilled, learned or experienced in a science, art, trade, business, profession or vocation. The expert must possess a thorough knowledge upon which he testifies that is not within the general knowledge and experience of the average person." Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 443 (Tenn. 1992) (citing Kinley v. Tennessee State Mut. Ins. Co., Inc., 620 S.W.2d 79, 81 (Tenn. 1981)).

Generally, the admission of expert testimony is largely entrusted to the sound discretion of the trial court. State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). The trial court's decision may be overturned on appeal only upon a showing that the trial court abused its discretion. Id. "The abuse of discretion standard contemplates that before reversal the record must show that a judge 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Coley, 32 S.W.3d 831, 833 (Tenn. 2000) (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)); see also State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

Here, testimony offered out of the presence of the jury established that Province was licensed as a mechanic, had repaired cars for a number of years, had rebuilt wrecked cars, and had operated a tow truck. He testified that he had also been involved in a number of car accidents. In our view, the trial court did not abuse its discretion in determining that Province did not possess the skill or experience necessary to testify as an expert in accident reconstruction.

V

The defendant next asserts that the trial court improperly admitted the blood alcohol test results from Bolivar Hospital and the testimony of Laura Kitchen because the state failed to establish a proper chain of custody. The state submits that the defendant has waived the issue by failing to lodge a contemporaneous objection to the evidence. In the alternative, the state argues that the chain of custody was sufficiently established.

As a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody. State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982). The purpose of the chain of custody requirement is to "demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). While the state is not required to establish facts which exclude every possibility of tampering, the circumstances established must

reasonably assure the identity of the evidence and its integrity. State v. Ferguson, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987). This rule does not require absolute certainty of identification. Ritter v. State, 462 S.W.2d 247, 250 (Tenn. Crim. App. 1970). Absent sufficient proof of the chain of custody, however, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." Neil P. Cohen et al., Tennessee Law of Evidence § 9.01[13][c] (4th ed. 2000). A leading Tennessee treatise provides as follows:

> The concept of a "chain" of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis. Obviously, any of these persons might have the opportunity to tamper with, confuse, misplace, damage, substitute, lose and replace, or otherwise alter the evidence or to observe another doing so. Each person who has custody or control of the evidence during this time is a "link" in the chain of custody. Generally, testimony from each link is needed to verify the authenticity of the evidence and to show that it is what it purports to be. Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession.

Id. The issue addresses itself to the sound discretion of the trial court; its determination will not be disturbed in the absence of a clearly mistaken exercise of such discretion. State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987); State v. Johnson, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). Reasonable assurance, rather than absolute assurance, is the prerequisite for admission.

Here, Ms. Kitchen identified her initials on certain of the medical records indicating that she had drawn the defendant's blood pursuant to a request from the emergency room physician. Although she was unable to specifically recall the incident, it was her policy to initial the records when she had performed the blood alcohol test. It is our view that this testimony was sufficient to establish "the identity of the evidence and its integrity." See Ferguson, 741 S.W.2d at 127.

VI

As his final issue, the defendant claims that the trial court erred by refusing his request that the jury be charged "fully" on the lesser included offenses of vehicular homicide and vehicular assault. He asserts that although the trial court provided instructions on the applicable lesser included offenses of the two crimes, the trial court should have included an additional instruction explaining how the jury should consider the lesser included offenses. The state argues that the instructions were proper.

"[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Jury instructions must, however, be reviewed in the context of the overall charge rather than in isolation. See Sandstrom v. Montana, 442 U.S. 510 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is

prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). While the defendant may request special instructions, jury instructions are sufficient where they adequately state the law. See, e.g., State v. Tyson, 603 S.W.2d 748 (Tenn. Crim. App. 1980). When a trial court's charge to the jury is complete, it need not give additional special instructions requested by the defendant. See State v. Story, 608 S.W.2d 599, 603 (Tenn. Crim. App. 1980).

The trial court provided the following instructions to the jury:

If you find the defendant not guilty of vehicular homicide as a result of intoxication as charged in the indictment, then your verdict will be not guilty of that offense, and then you should proceed to determine his guilt or innocence of vehicular homicide as a result of reckless conduct. If you find the defendant not guilty of this offense, or if you have a reasonable doubt as to his guilt as to this offense, you must find him not guilty of that offense, and then you should proceed to determine his guilt or innocence of the lesser offense of driving under the influence.

The next count of the indictment, if you find the defendant not guilty of vehicular assault, or have a reasonable doubt as to his guilt of vehicular assault, then you should find him not guilty, and then you will proceed to reckless endangerment. If you find, however, that the State has proven the defendant guilty beyond a reasonable doubt, then you should find him guilty. If you find the State has not proven beyond a reasonable doubt the defendant's guilt, or if you have a reasonable doubt, then you shall find him not guilty.

Because the instructions provided by the trial court are a correct statement of the law, it is our view that the trial court did not err by refusing the defendant's special request.

Accordingly, the judgments of the trial court are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE