STATE of Tennessee, Appellee,

v.

Paul Silas GOODMAN, Appellant.

Court of Criminal Appeals of Tennessee, at Knoxville.

Aug. 31, 1982.

Permission to Appeal Denied by Supreme Court Nov. 22, 1982.

Robert T. Beaty, Bruce A. Butler, Sexton, Sexton, Beaty & Seals, Oneida, for appellant.

William M. Leech, Jr., Atty. Gen., Steven A. Hart, Asst. Atty. Gen., Nashville, William Paul Phillips, Dist. Atty. Gen., Clifton H. Sexton, Asst. Dist. Atty. Gen., Huntsville, for appellee.

## OPINION

SCOTT, Judge.

Indicted for murder in the first degree, the jury found the appellant guilty of murder in the second degree and sentenced him to twenty-five years in the state penitentiary. Much aggrieved by the verdict, the appellant has presented seven issues on appeal, some of which have subissues.

■ In the first issue the appellant contends that the trial judge improperly allowed amendment of the indictment. The original indictment in this case charged the appellant as follows:

> The Grand Jurors for the State of Tennessee, duly elected, impaneled, sworn and charged to inquire in and for the body for the County of Scott in the State of Tennessee, upon their oath present: That Paul Silas Goodman prior to the finding of this indictment, on or about September 22, 1976, in the County and State aforesaid with hands, objects and fire, did unlawfully, feloniously, willingly, premeditatedly, and with malice aforethought, kill and burn one Alene Burress and commit murder in the first degree, against the peace and dignity of the State of Tennessee.

The state filed a motion to amend the indictment to add the word "deliberately" so that the indictment would allege that the appellant "did unlawfully, feloniously, deliberately, willfully, premeditatedly, and with malicious aforethought" kill Alene Burress.

Rule 7(b), T.R.Cr.P., provides that an indictment may be amended without the defendant's consent and before jeopardy attaches if "no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced".

The addition of the word "deliberately" did not charge a different offense. As originally drawn, the indictment referred to the offense as "murder in the first degree" evidencing the grand jury's intent to charge the appellant with that offense.

Further, the appellant has failed to demonstrate any prejudice from the amendment. The motion to amend was filed over four months before trial, giving the appellant ample time to prepare his defense. In addition, the appellant was convicted of murder in the second degree rather than the more serious offense. Hence, there clearly was no prejudice to him. This issue has no merit.

In the next issue the appellant contends that the trial judge erred in granting the state's motion for a continuance on May 27, 1980, and by disallowing his motion for a reduction in bail made that same day.

May 27, 1980 was the original date set for the trial of this case. The state claimed that although subpoenaed, a material, indeed critical, witness failed to appear. According to the state's affidavit, the witness, Rueben West, would testify (and later did testify) that the appellant bragged to him about having sexual relations with the deceased, and told Mr. West that he killed her "because she was going to tell on him for having sex with her". It can hardly be questioned that such testimony was relevant and material to the presentation of this circumstantial evidence case.

The appellant argues that the testimony was cumulative to that of Patsy Stanley who also testified that the appellant told her that he had killed "that Burress woman".

378

The granting of a continuance is a matter resting within the sound discretion of the trial judge. *Moorehead v. State,* 219 Tenn. 271, 409 S.W.2d 357, 358 (1966). His exercise of that discretion will not be disturbed absent a clear showing of prejudice to the defendant. The burden rests upon the party seeking the continuance to show how the court's action was prejudicial. The only test is whether the defendant has been deprived of his rights and an injustice done. A reversal will be ordered only if the reviewing court is convinced that the complaining party did not have a fair trial *and* a different result would or might reasonably have been reached had there been a different disposition of the motion. (emphasis added) *Baxter v. State,* 503 S.W.2d 226, 228 (Tenn.Cr.App.1973), citing Higgins and Crownover, *Tennessee Procedure in Law Cases,* § 885.

While the testimony of Mr. West was cumulative to that of Ms. Stanley to the extent that the appellant confessed the murder to each, his testimony went far beyond Ms. Stanley's in that it explained the sexual motive for this gruesome murder. The trial judge did not abuse his discretion in granting the motion for a continuance. Our review of the record reveals that the appellant received a fair trial. While the appellant might have been acquitted had this damning proof not been introduced, such a result would not have been just. The trial of criminal cases is not a game, but a serious quest for truth about matters of grave importance to our society. Justice is the ultimate goal of every judicial proceeding. This issue has no merit.

The second aspect of this issue concerning the disallowance of the appellant's motion for reduction in bail is not preserved in the record and is not briefed. Therefore, this issue was waived. Rule 24(a) and (b), T.R.A.P., Rule 27(a)(7), T.R.A.P.

The appellant next complains about the state's failure to comply with his discovery motion under Rule 16, T.R.Cr.P. Six subissues are set forth under this issue. He complains that the state failed to allow discovery within the time frame set by order of the court; failed to furnish transcripts of interviews with Ethel Buttram; and failed to permit defense counsel to inspect and copy results of tests conducted by the Federal Bureau of Investigation Laboratory. According to the appellant, the court erred in allowing Allen T. Robillard, an F.B.I. agent, to testify over the appellant's objection, and erred in denying a mistrial after he testified. The appellant contends that he was denied a fair trial due to a deliberate pattern of conduct of the District Attorney General to conceal witnesses and evidence from defense counsel to prevent discovery of material evidence in this case. He contends that the court erred in allowing the state to call witnesses who were listed and subpoenaed after May 25, 1980, and particularly after May 27, 1980. The appellant complains that the autopsy report prepared by Dr. Francis Jones was not given to defense counsel until four days prior to the original trial date; that the written report of Dr. David Icove of the State Fire Marshal's Office was tendered on the original trial date; and that the report of Mr. Robillard was given to defense counsel on the second day of trial.

By affidavit of the District Attorney General, the state claims that it had no knowledge that an autopsy had been performed on the deceased until shortly before May 23, 1980. However, on the day the body was discovered an order for an autopsy was signed by the District Attorney General, who participated in the trial of the case. When contacted by the state, Dr. Jones stated that his report had been dictated but had never been typed. At the request of the prosecution, the report was typed and distributed to defense counsel soon thereafter. This all occurred near the original trial date, but the case was continued and did not actually go to trial until July 15, 1980. Although the state clearly was not diligent in getting the autopsy report to defense counsel, the appellant was shown no prejudice from the failure to provide him the report until May 1980.

Likewise, the state claims it was unaware that Dr. Icove had prepared a written re-

port of his findings until shortly before May 27, 1980, when the appellant was furnished his copy. Dr. Icove was an investigator for a state agency. His report was a report of a scientific test material to the defense, which was in the "possession, custody or control of the state", and its existence was known or by the exercise of due diligence may have become known to the District Attorney General. Rule 16(a)(1)(D), T.R. Cr.P. But, the appellant has shown no prejudice from having access to Dr. Icove's report for only a month and a half before trial.

Mr. Robillard's report was a fiber and hair analysis and was not given to the appellant until the second day of trial. This appears to be an apparent flaunting of the discovery rule. However, even this can be explained. According to the District Attorney General's affidavit, there was a discovery conference at which all laboratory reports which the state then had were given to the appellant. One F.B.I. examiner, a Mr. Wallace, had a heart attack and thus became unable to testify. The evidence was then re-examined by Mr. Robillard whose name was furnished to defense counsel. His report did not become available until he came from Washington, D.C. for the trial. The state then furnished his report to the appellant's counsel. Apparently, Mr. Wallace's report was given to defense counsel at the discovery conference.

Rule 16(a)(1)(D), T.R.Cr.P. provides:

Upon request of a defendant the state shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial.

The state provided the autopsy report and Dr. Icove's report in ample time for the appellant to prepare for trial. There was no error in regard to these reports.

Contrary to the state's assertion, Mr. Robillard's report was "within the possession, custody or control of the state". When the state utilizes the facilities of the F.B.I. Laboratory for various scientific tests, the F.B.I. is an agent for the State of Tennessee, and reports in its possession are in the state's possession for the purposes of Rule 16(a)(1)(D), T.R.Cr.P. Even though the second day of trial is very late for the providing of a report of this nature, the appellant's counsel had an opportunity to examine it prior to the agent giving any of his testimony. Defense counsel conducted an extensive cross-examination of the witness concerning tests which were conducted during his hair and fiber analysis. Counsel also questioned Mr. Robillard about other tests, including neutron activation analysis, gas chromotography, infrared absorption, visible and ultraviolet absorption, atomic absorption, and x-ray refraction.

When the trial judge inquired of defense counsel what he would have done differently had the report been furnished earlier, he contended that he would probably have moved for a continuance so that he could attempt to contact a textile expert.

■ Even if an expert had been contacted, the employment of an expert witness at state expense is not authorized or required in the absence of a threshold showing of a denial of due process by the failure to employ such an expert. *State v. Scott Robert Dussia,* Tennessee Criminal Appeals, opinion filed at Knoxville, April 1, 1982.

■ In view of the vigorous and learned cross-examination of Mr. Robillard, there was no prejudice to the appellant from the late disclosure of the agent's report. Rule 36(b), T.R.A.P.

■ The appellant also contends that the prosecution failed to disclose exculpatory material as required by *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215 (1963). Portions of a statement given by Ethel Buttram imply that the appellant did not murder the deceased. As such, the state was under a duty to provide

this evidence to defense counsel. *Id.* Failure to do so was error. However, in this case it was harmless. Mrs. Buttram was equally available to both sides, and defense counsel was aware of the fact that she was a potential witness and the nature of her testimony. He failed to call her as a witness. By failing to take action to prevent or nullify the harmful effect of the error, no relief will be granted. Rule 36(a), T.R.A.P.

The appellant also objects to the addition of witnesses to the witness list after the return of the indictment. He contends that it was error to refuse to exclude the testimony of all witnesses added to the list after May 25, 1980, the date on which the case was originally set.

TCA § 40–2407 provides:

It shall be the duty of the district attorney to indorse on each indictment or presentment, at the term at which the same is found, the names of such witnesses as he intends shall be summoned in the cause, and sign his name thereto.

■■■■ This provision is directory only, and a witness is not disqualified even though his or her name is entirely omitted from an indictment. *Houston v. State,* 567 S.W.2d 485, 488 (Tenn.Cr.App.1978). In order to complain about the introduction of testimony from a witness not listed on the indictment, the appellant must show how he was prejudiced. *State v. McCray,* 614 S.W.2d 90, 94 (Tenn.Cr.App.1981). The appellant has failed to show any prejudice from the addition of witnesses' names to the list of those to be called. The last addition to the witness list was made a full week before the beginning of the trial. Neither the subissues nor this issue has any merit.

Next the appellant contends that he was denied a fair trial by the deliberate misconduct of the prosecutor in his examination of Rueben West and by improper argument.

Specifically, he objects to the questioning of Rueben West about sexual advances that the appellant made toward a woman other than the deceased, and about warnings that Mr. West gave his own girlfriend about the

appellant. These questions were objected to by defense counsel, and the objections were sustained by the trial judge.

■■■■ Concerning the argument, the appellant claims that the District Attorney General erred by arguing to the jury about the lack of credibility of Ethel Buttram who was never called to testify. The prosecutor's comments about the credibility of Mrs. Buttram were clearly outside the record, but the appellant interposed no objection to the argument. Without a contemporaneous objection, the error was waived. *State v. Sutton,* 562 S.W.2d 820, 825 (Tenn.1978).

■■■■ It is also contended that the prosecutor erred in falsely arguing that the appellant had objected to the introduction of statements made by him. In reality, the state never sought to introduce any statements made by the appellant to law enforcement officers. During the defense counsel's final argument, the prosecution objected to any mention of a statement given by the appellant on the grounds that defense counsel had previously objected to the introduction of the statements. Defense counsel then commented that the state chose not to introduce the statements, and the District Attorney General again objected. The trial judge twice admonished the jury concerning the alleged statements. First he told them:

Proceed with the argument. There is nothing we can do at the bench that will alter the situation. Proceed, Mr. Beaty. Ladies and Gentlemen, if there is any implication by the comment of the Attorney General that he thought he meant statements made to the State ignore that in it's (sic) entirity. (sic) It's not part of the evidence in this case, and it's not to be considered. Proceed, Mr. Beaty.

There followed additional comments between defense counsel and the District Attorney General about the alleged statements. The judge again admonished the jury as follows:

Just a moment, gentlemen. Ladies and Gentlemen, ignore any comments about alleged statements which are not part of

the evidence in this case. Mr. Beaty, move along to something else, please. The evidence is complete. You will not consider what Counsel says as being evidence in any way, shape or form. That applies to Counsel for the State and the Defendant. Proceed.

It is presumed that the jury followed the trial judge's admonition. *State v. Barton,* 626 S.W.2d 296, 298 (Tenn.Cr.App.1981). This issue has no merit.

In the next issue the appellant contends that the court erred in allowing three of the state's witnesses to testify concerning examinations and tests they performed on a body alleged to be that of the victim when the chain of custody of the corpse was not established.

■ As a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody. *Bolen v. State,* 544 S.W.2d 918, 920 (Tenn. Cr.App.1976). Whether the requisite chain of custody has been sufficiently established to justify admission of an exhibit is a matter committed to the discretion of the trial judge, and his determination will not be disturbed in the absence of a clearly mistaken exercise of that discretion. *Ritter v. State,* 3 Tenn.Cr.App. 372, 462 S.W.2d 247, 249 (1970).

Dr. Maxwell Huff, the Scott County Medical Examiner, examined the corpse, but due to its badly burned condition was unable to determine anything about it, even the sex of the deceased. It was described by Dr. Huff as just a "blob". The destruction of this body exceeded anything he had ever seen. He sent the body to the University of Tennessee Hospital via Scott County Ambulance Service.

Dr. Francis Seymour Jones, a Pathologist at UT Hospital and an Assistant State Medical Examiner, testified that on September 23, 1976, he received a corpse from Dr. Huff. Dr. Jones testified that bodies are received at the hospital by a procedure about which he had no knowledge and over which he had no control. However, he introduced documents which were received with the corpse indicating that Dr. Huff was the sender.

Because of the badly burned condition of the remains, Dr. Jones' autopsy was inconclusive. Therefore, he sought the assistance of Dr. William Bass, a forensic anthropologist at the University of Tennessee at Knoxville. Dr. Bass examined the remains and sent a bone sample to Dr. Ellis Kurley, a Professor of Anthropology at the University of Maryland, for further testing.

The appellant contends that the proof does not establish that the corpse examined by Drs. Jones, Bass, and Kurley was the same one sent by Dr. Huff. Dr. Huff testified that the body he sent to Dr. Jones was approximately 90% cremated and generally unrecognizable. Dr. Jones testified that the papers he received indicated that the body had been sent to him by Dr. Huff of Scott County, and his examination revealed that it was a corpse which he also described as being 90% burned. Dr. Jones described the body as "very badly burned". According to him, "there really wasn't a whole lot of body left"; "the entire thorax of the body was burned so that the internal organs were no longer identifiable"; "almost all of the soft tissues of the body were gone"; "only the liver was identifiable"; and the bones were broken by fire fractures and resulted in there being a "pile of just bones".

■ Given the distinct characteristics of this corpse, as compared to the other corpses being examined at the UT Hospital, it is obvious that the corpse these doctors examined was the same one sent by Dr. Huff. The chain of custody was thoroughly established, and this issue has no merit.

In the next issue the appellant contends that the trial judge erred by charging the jury that they may infer guilt from the flight of the accused, together with all the other facts of the case.

The appellant contends that the only evidence that he left Scott County was provided by Rusty Davidson, his son-in-law, who testified that the appellant left the county

thirteen months after the murder. However, other witnesses testified that the appellant became extremely nervous and jumpy when informed that fingerprints were to be taken from a piece of tin found at the scene and when told that he was to be arrested for the crime.

The fact that a defendant fled from the vicinity of the crime or concealed himself with knowledge that he would likely be arrested for the crime may be shown as a circumstance tending to indicate guilt. *Hall v. State,* 584 S.W.2d 819, 821 (Tenn.Cr. App.1979). Any ex post facto indication by the defendant of a desire to evade prosecution may be shown as one of a series of circumstances from which guilt may be inferred. *State v. Braggs,* 604 S.W.2d 883, 886 (Tenn.Cr.App.1980).

There was evidence from which the jury could determine that the appellant fled. Therefore, the instruction concerning flight was proper. The trial judge further instructed the jury that "(w)hether there was flight by the defendant, the reasons for it, and the weight to be given to it are questions for you to determine". This instruction, taken from T.P.I.—Crim. § 37.16, correctly set forth the jury's responsibility concerning the flight issue. This issue has no merit.

In his final issue the appellant challenges the sufficiency of the convicting evidence.

Eugene Duncan of Cincinnati, Ohio, owned property in Scott County, near the River Junction Road. Located thereon were a house and an outbuilding. The outbuilding had been used for storage for over twenty years. It was secured with a lock and chain and had a piece of tin nailed over one of the windows.

At approximately 3:30 P.M., on September 22, 1976, the outbuilding burned to the ground. Gerald Hembree, a neighbor who lived about one hundred yards from the outbuilding, went to the scene, but nothing could be salvaged. He noticed that the piece of tin over the window was folded in two and the nails in the metal appeared to have been pulled out. Mr. Humbree also

noticed that two areas of the building, one near the front door and the other near the flue liner, appeared to be burning more intensely than the other areas.

On September 22, 1976, Shirley Gail Burress Phillips lived at home with her parents, Ted and Aileen Burress. At approximately 10:00 A.M. that day, she noticed that her mother was gone from the family home. She telephoned relatives nearby and confirmed that her mother was not visiting them. She then drove to Helenwood where her father was at work for the SRS Coal Company and informed him of her mother's strange disappearance. Mr. Burress returned home with his daughter, and when they arrived Mrs. Burress was back home. She claimed that she had been out walking, heard dogs barking, became frightened, and returned home. Being assured that his wife was alright and that she would not persist in her peregrinations, Mr. Burress returned to work. Later, Mrs. Phillips went to the store to get some ice cream for her mother. Upon her return home, she again found that her mother was gone. This time she found a note from Mrs. Burress, in which her mother stated that she had gone to visit her son in Helenwood. Since Mrs. Burress had no car available, Mrs. Phillips' suspicions were aroused when she learned that no relatives had given her mother a ride to Helenwood, and it was highly unlikely that she would embark on a journey of that distance on foot.

At 5:00 P.M., Mrs. Phillips returned to the coal company and informed her father of her mother's second disappearance. A search was conducted by Mr. Burress, the sheriff's department, and others, but Mrs. Burress could not be located.

Mrs. Phillips testified that at the time of her disappearance her mother was wearing a red blouse and peach colored pants. Mrs. Burress was forty-three years old, was right-handed, wore an upper dental plate, and wore a .14 karat gold Keepsake ring.

The next morning a badly burned corpse was discovered in the charred debris where the building had stood. A ring, positively identified as Mrs. Burress' wedding band,

was found in the ashes, as was a partial upper dental plate.

Nona Lee Chambers, a rural mail carrier, saw Mrs. Burress at approximately 12:55 P.M. on the day of her disappearance. According to Ms. Chambers, Mrs. Burress was walking briskly away from her house wearing slacks and a blouse, one of which was a lighter shade of red than the other. Her hair appeared to have been recently washed, "and she looked very neat and pretty".

At 3:25 P.M. on September 22, 1976, James Capps was on his way to work. He saw the appellant walking along the River Junction Road. As Mr. Capps approached, the appellant turned away from his vehicle, but later came up and conversed with Mr. Capps for about five minutes. When another car approached, the appellant squatted down, opened the door on the passenger side of the car and continued his conversation from that position.

Patsy Cantrell worked in the Civil Defense Office in the Education Building in Huntsville. On September 22, 1976, she saw the appellant pass her office window three times—shortly after arriving at work, around lunch time, and again at approximately 3:30 P.M., when he was walking toward town from the direction of the Duncan property.

Dr. David Icove, an Arson Investigator for the State Fire Marshal's Office, examined the fire scene on September 23, 1976, and determined that two separate fires had started within the building. His conclusion was drawn in part from the fact that there were two "hot spots" in the ashes where melted glass was found, indicating intense heat which would not have ordinarily been generated by the burning of a wooden structure. Near one of the hot spots the remains were found. The heat of the fire was so great that some of the wood adhered to the remains. The body was more badly burned than any corpse that Dr. Icove had ever seen in his investigations. When asked what would cause such extensive burning, he stated that a lot of combustible material was placed around the body in order to produce very intense heat. This was, according to Dr. Icove, the method used by American Indians to burn corpses. A flammable liquid could also be used to accelerate the fire.

At trial Dr. Icove identified a number of items found near the remains. These included a lighter fluid can, an ax head, the gold wedding ring, and nine teeth.

Dr. Huff, the Scott County Medical Examiner, examined the remains at the scene. Due to the extensive burning, he was able to determine only that it was the remains of a human being, and that the cause of death was cremation by fire. He sent the body to Knoxville for an autopsy.

Dr. Jones conducted the autopsy. He testified that the body was badly incinerated, and that from the body structure, it was probably a female. Dr. Jones enlisted the assistance of Dr. Bass who concluded that the body was that of a Caucasian woman between the ages of forty and forty-eight. Because of the larger bones on the right hand side of the body, he concluded that she was right-handed. From the fact that the enamel teeth found near the body had pegs in them, he concluded that the woman had an upper dental plate. The lower teeth, although fragmented, were still in the jaw, indicating that they were natural.

In order to more accurately ascertain the age of the victim, Dr. Bass sent a bone sample to Dr. Kurley. Dr. Kurley testified by deposition that in his opinion the victim was forty-six years of age ± five years.

The day after the outbuilding burned, a witness saw the appellant walk into the Scott County Courthouse and place a paper bag behind a voting machine in the hallway. The bag contained a jacket and a pair of jeans. In the pocket of the coat were two medicine bottles with the appellant's name on the prescription labels.

These items were sent, along with the clothing that Mrs. Burress wore at the time of her first disappearance, to the F.B.I. Laboratory. Robert W. Holt of the Serology Unit of the laboratory examined the clothes for the presence of blood and semen.

The only human blood was on the right sleeve of the jacket.

Mr. Robillard examined the appellant's jeans and Mrs. Burress' clothes and found similar red polyester fibers on both sets of clothing. It was his opinion that the fibers may have had a common source, and that it is rare to find such a fiber match. A few blonde Caucasian pubic hairs and one blonde Caucasian head hair were also found on the appellant's clothing. Microscopic analysis of these hairs revealed that they were dissimilar to the hairs on the appellant's head and pubis.

The proof revealed that Mrs. Burress had brown hair, but since she worked in the garden a great deal her hair was bleached either blonde or light red by the sun. There was no proof regarding the color of her pubic hair.

Approximately three days after the body was found, Clyde Parton, a long time acquaintance of the appellant, talked to the appellant outside the courthouse. Mr. Parton commented that, "It sure was bad about that woman burning up in that house up there". The appellant said, "she wudn't nothin' but a damn whore", and that he'd "fucked her a thousand times".

The appellant then gave Mr. Parton a graphic description of the woman's body. He talked on and on about "Aileen". The appellant also told Mr. Parton that they had met many times at the shack that burned. They gained entry by pulling a piece of tin off the window. The appellant continued to describe their sexual activities and claimed that he "broke her damn neck". He further told Mr. Parton that he wrapped her in a bunch of rags, poured diesel fuel on her and set her afire. Mr. Parton immediately reported this conversation to the District Attorney General.

Approximately a week or two later, Mr. Parton and the appellant were at the home of Archie Bill Buttram and Ethel Buttram. Mr. Parton mentioned that officials from Knoxville or Oak Ridge were coming to Scott County to attempt to lift fingerprints from the piece of tin found at the fire scene. The appellant became very agitated and began pacing the floor. Later, when Mr. Parton started to drive the appellant back to town, the appellant got in the back seat of the car instead of the unoccupied front seat. His conversation on the way to town was disjointed.

About a week or ten days after the discovery of the corpse, Charles Anderson had a conversation with the appellant about the fire. It was mentioned that without fingerprints an arrest was improbable, and the appellant stated that once the place was burned there was no way anybody could get fingerprints. Later, at the Buttrams' home, Mr. Anderson told the appellant that he had heard that the appellant was to be arrested. The appellant hopped to his feet as if to run and told the Buttrams, who were also present, to take him to see Jess Harness on Capital Hill to sign his bond.

Rueben West, a close, personal friend of the appellant, testified that they met at the charcoal kilns sometime after the body was discovered. Both were drinking, and the appellant said that Mrs. Burress "had the smoothest legs of any woman he had ever been out with", "that she was a beautiful woman", and "(t)hat she had some good stuff". Later that same morning, Mr. West testified that:

We'se standing there a talking and he said they was a going to catch him. And I asked him who was going to catch him, and he said the law. And I said what for, and he said, for killin' that woman. And I said what woman, Paul? And he said, that Burress woman. And I told him, I said Paul you didn't do that. He said, Yes I did, too. Then that's when he wobbled down there and fell over some pipe stuff and passed out.

Rueben West's girlfriend, Patsy Stanley, testified that she was with her boyfriend and the appellant in Mr. West's car approximately a month after the fire. The men had been drinking on this occasion and Mr. West passed out. The appellant told Ms. Stanley that the police were going to get him "fer killin' that Burress woman".

The appellant presented the testimony of four witnesses, but this proof in no way exculpated him. The appellant did not testify.

The jury obviously accredited the testimony of the state's witnesses and found the appellant guilty of the lesser included offense of murder in the second degree.

A jury verdict of guilty, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the theory of the state. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978). On appeal the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

A crime may be proven wholly by circumstantial evidence. *Duchac v. State,* 505 S.W.2d 237, 241 (Tenn.1973). To warrant a conviction based solely upon circumstantial evidence, the facts must be consistent with the guilt of the defendant, inconsistent with his innocence, and must exclude every other reasonable theory or hypothesis except that of guilt. *Pruitt v. State,* 3 Tenn.Cr.App. 256, 460 S.W.2d 385, 390 (1970). The determination of whether all reasonable theories of innocence are excluded by the evidence is primarily a question of fact for the jury. *Id.,* 460 S.W.2d at 391. In circumstantial evidence cases, single facts of themselves may each account for little weight, but when they are pieced together the facts and circumstances may unerringly point the finger of guilt to the defendant to the exclusion of all other beyond a reasonable doubt. *Hicks v. State,* 490 S.W.2d 174, 178 (Tenn.Cr.App.1972).

Based upon the proof in this record, there was ample, indeed overwhelming, evidence from which any rational trier of fact could find the appellant guilty beyond a reasonable doubt. Rule 13(e), T.R.A.P., *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2786–2792, 61 L.Ed.2d 560 (1979). This issue has no merit.

Finding all of the issues to be without merit, the judgment is affirmed.

We note that the transcript of this lengthy trial was not filed until over a year and a half after the case was tried. All of the reasons why the transcript took so long are not known. However, one reason stands out. The record contains 206 pages of voir dire examination. Yet, the appellant has presented no issue concerning the voir dire or the composition of the jury. The inclusion of this voluminous material was at taxpayers' expense, since the appellant had appointed counsel. It is undue burden on the taxpayers of this state to require them to pay for the transcription of a useless record. Trial judges, counsel, and court reporters are admonished to eliminate such extraneous material from the records on appeal.

O'BRIEN and CORNELIUS, JJ., concur.