IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 14, 2003

## STATE OF TENNESSEE v. RICKY LYNN LITTRELL

**Appeal from the Circuit Court for Bedford County**
**No. 14840     Lee Russell, Judge**

---

**No. M2002-01298-CCA-R3-CD - Filed August 27, 2003**

---

The defendant, Ricky Lynn Littrell, was convicted by a Bedford County Circuit Court jury of theft of property valued more than $1,000 but less than $10,000, a Class D felony, and the trial court sentenced him as a career offender to twelve years in the Department of Correction. In this delayed appeal, the defendant claims that (1) the evidence is insufficient to support his conviction; (2) the trial court erred by allowing the stolen merchandise into evidence because a chain of custody had not been established; and (3) the trial court erred by allowing a list of the stolen merchandise into evidence because the testifying witness did not properly authenticate the list pursuant to Rule 901, Tenn. R. Evid. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Donna Leigh Hargrove, District Public Defender; and Michael J. Collins, Assistant District Public Defender, for the appellant, Ricky Lynn Littrell.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; William Michael McCown, District Attorney General; and Andrew Jackson Dearing, III, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case relates to the theft of ink pens from Sanford Corporation. Neville C. Adolf testified that in June 2000, he was Sanford's Shipping Manager and responsible for Sanford's shipment of products to retail stores. He said that he was very familiar with Sanford's products and retail prices and that Sanford sold and shipped all types of writing instruments, including mechanical pencils, highlighters, and ink pens. He said that Sanford's cost for producing the ink pens was referred to as the "cost price" and that the price Sanford charged retail stores was referred to as the "wholesale

price." He said that when retail stores received Sanford's products, they marked up the prices thirty to forty percent and sold the products to customers.

Mr. Adolf testified that in 2000, the defendant and Kenneth Western lived at the Tony Rice Center, a halfway house for people with drug and alcohol problems, and worked part-time for Sanford's distribution center in Bedford County. He said that on June 22, 2000, a man from the Tony Rice Center told him that the defendant and Mr. Western had stolen property from Sanford. He said he telephoned Jim Metler at the Tony Rice Center and asked Mr. Metler to search the defendant's and Mr. Western's rooms for Sanford products. He said that about ten minutes later, Mr. Metler telephoned and told him that ink pens had been found in the rooms. He said that he telephoned the police and met them at the Tony Rice Center. He said that he verified the ink pens belonged to Sanford Corporation and that he took the stolen pens back to the distribution center. He said that he asked another Sanford employee to prepare an inventory list of the recovered pens and that the price of the stolen pens ranged from $1 to $60 each. He said that some of the more expensive pens were worth $40 to $60 each, that the total wholesale value of the stolen pens was $1,100 to $1,200, and that the total retail price of the pens would have been higher. He said he put the stolen items into a box, put the box into an empty cubicle at the distribution center, and told other employees to stay away from it.

On cross-examination, Mr. Adolf testified that Sanford Corporation kept ink pens worth more than $15 in a security cage at the distribution center and that the defendant did not have access to the cage. He said that at the time of the thefts, the defendant had worked at Sanford for about six months and that he had thought the defendant was a good employee. He said that after Mr. Metler found the stolen pens in the defendant's and Mr. Western's rooms, Mr. Metler put the items into one bag and gave the bag to him. He said that he was not present during Mr. Metler's search of the rooms and that he did not actually see stolen pens in the defendant's room. He said that Sanford routinely gave damaged and discontinued pens to employees but that damaged or discontinued pens kept in the security cage were always returned to the manufacturer.

Jim Metler, the Director for the Tony Rice Center, testified that residents of the Center were required to be employed and that Sanford had employed residents before. He said that in June 2000, the defendant and Mr. Western were residents at the Center and that he received a telephone call from someone at Sanford. He said that as a result of the call, he suspected that the defendant and Mr. Western had stolen ink pens worth $50 to $60 each and searched the defendant's and Mr. Western's rooms. He said that he found eight or nine of the expensive ink pens in a black bag in Mr. Western's closet and that the pens were still wrapped in packing material. He said he found about eighteen expensive pens in the defendant's room under the defendant's roommate's bed. He said he telephoned Sanford Corporation and returned the ink pens. He said that the next day, he discharged Mr. Western and the defendant from the Tony Rice Center. He said the men denied taking the pens but told him that other employees had stolen the pens and given them to the defendant and Mr. Western. He said the defendant admitted putting the stolen pens under his roommate's bed.

J.B. Broadous, Sanford's Distribution General Manager, testified that he oversaw Sanford's daily operations and was familiar with Sanford's products and prices. He said he asked Linda Black, Sanford's Inventory Control Coordinator, to inventory and make a list of the recovered items. He said that after Ms. Black prepared the list, he "spot [checked]" it to make sure it was accurate. He said that the total wholesale value of the pens recovered from Mr. Western's and the defendant's rooms was $1,189.11. On cross-examination, Mr. Broadous testified that after Mr. Metler returned the stolen pens to Sanford, the pens were kept in a sealed box in a training room. He said that the room was secure but that six or seven employees had keys to the room. He said that he did not personally inventory the stolen items. He said that the stolen items were inventoried twice, once in June 2000 and more recently for trial. He said that the old and new inventory lists showed the same items and the same wholesale values. The jury found the defendant guilty of theft of property valued more than $1,000 but less than $10,000.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his conviction because the state failed to prove that the value of the ink pens found in his room was more than $1,000. Specifically, he argues that because Jim Metler placed the pens found in his room into a bag with the pens found in Mr. Western's room, it was impossible to determine the value of the pens that were under the defendant's control. He argues that because the state did not prove the value of the pens found in his room, the evidence only supports a misdemeanor conviction for theft of property valued less than $500. The state claims that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

As charged in the indictment, a person commits theft of property "if, with intent to deprive the owner of property, the person knowingly . . . exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. In this case, the evidence shows that the defendant is guilty of theft of property valued more than $1,000 but less than $10,000. Although the defendant claims that he cannot be held responsible for the value of the pens found in Mr. Western's room, we note that Jim Metler testified as follows:

> Q.     All right. Did they say how they came to be in possession of
>          the pens?

A.      Yes. They told me that the pens were given to them by other employees that they walked up on going to their car to come home. And so they gave them the pens because the other employees had stolen them and they were given to them so they wouldn't talk.

We believe this testimony is sufficient to establish that the defendant and Mr. Western exercised control over the pens together and that each was responsible for the total value of the theft. Neville Adolf and J.B. Broadous testified that they were familiar with the value of Sanford's ink pens and that the pens recovered from the defendant's and Mr. Western's rooms had a wholesale value over $1,000. Thus, the evidence is sufficient to support the defendant's conviction.

## II. CHAIN OF CUSTODY

Next, the defendant claims that the trial court erred by allowing the state to introduce into evidence the ink pens found in the defendant's and Mr. Western's rooms because the state had not established a chain of custody for the pens. He contends that the chain of custody for the pens was "contaminated" when Jim Metler mixed the pens he found in the defendant's room with the pens he found in Mr. Western's room. In addition, he claims that a chain of custody for the pens could not be established because Sanford officials placed the pens in a box and stored the box in a room that other employees could access. He argues that as a result, the pens "could have easily been replaced with more expensive pens, or someone could have added more pens to the box." The state claims that the trial court properly admitted the pens into evidence. We agree with the state.

In determining the admissibility of tangible evidence, it is sufficient if the evidence establishes a reasonable assurance of the identity of the evidence. State v. Woods, 806 S.W.2d 205, 212 (Tenn. Crim. App. 1990). Absent a clear mistake or abuse of discretion, the decision of the trial court concerning the sufficiency of evidence as to the chain of custody will not be disturbed. Wade v. State, 529 S.W.2d 739, 742 (Tenn. Crim. App. 1975); State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982).

During Neville Adolf's testimony, the state requested that a box containing the ink pens found in the defendant's and Mr. Western's rooms be admitted into evidence. The defendant objected, claiming that the state had failed to show that the box contained the same pens that Mr. Metler found at the Tony Rice Center. The trial court overruled the objection, stating that the defense could cross-examine Mr. Adolf about the chain of custody for the pens.

We believe the trial court properly admitted the ink pens into evidence. Jim Metler testified that he found eight or nine expensive ink pens in Mr. Western's room and about eighteen expensive pens in the defendant's room. He then placed all of the pens into one bag and gave the bag to Neville Adolf. Given that we concluded in the section above that the defendant was accountable for all of the ink pens found in his and Mr. Western's rooms, there is no merit to his claim that the chain of custody was "contaminated" by Mr. Metler's placing all of the ink pens into one bag. Mr. Adolf

-4-

had another Sanford employee inventory the pens and prepare a list showing each pen and its wholesale value. According to Mr. Adolf, the pens then were placed in a box, the box was stored in an empty cubicle at the Sanford distribution center, and Sanford employees were instructed to stay away from the box. During Mr. Adolf's testimony, the state showed him a box of ink pens, and he identified it as the same box that had been stored at the distribution center since June 2000. We note that J.B. Broadous later testified that sometime before trial, the box of pens was reinventoried and the total wholesale value of the items on the second inventory list matched the total wholesale value of the items on the June 2000 list, indicating that no one had tampered with the recovered ink pens. We conclude that the trial court properly admitted the ink pens into evidence.

### III. INVENTORY LIST

Finally, the defendant claims that the trial court erred by allowing the state to introduce the second inventory list into evidence because J.B. Broadous could not authenticate the list. The state claims that the trial court properly admitted the list into evidence. We agree with the state.

J.B. Broadous testified that in June 2000, a Sanford employee inventoried the pens found in Kenneth Western's and the defendant's rooms and prepared an inventory list. He also testified that sometime before trial, the box of ink pens was reinventoried, a second list was prepared, and the items and wholesale prices on the second list matched the items and wholesale prices on the June 2000 list. The state showed Mr. Broadous a copy of the second inventory list and the following exchange occurred:

> Q. Is that a copy of the inventory of the box that's Exhibit 1 that was prepared at your direction?
>
> A. Yes, it is.
>
> Q. And have you seen and verified that, in fact that is an accurate inventory of the contents of Exhibit No. 1?
>
> A. Correct, I did spot check and verify.
>
> . . . .

The state then asked that the trial court admit the second inventory list into evidence, and the defense objected on the grounds that Mr. Broadous had not prepared the list and was not the custodian of Sanford's records. The trial court asked the state to question Mr. Broadous further about the inventory list, and Mr. Broadous's testimony continued as follows:

> Q. Did this inventory that you had prepared, were you present when that was being done?

A. I was not physically present when it was being done. I did leave specific instructions on how to inventory as well as what areas to confirm the actual prices.

THE COURT: All right. Then I need to know what he means by spot checking.

A. I checked one or two items on the list, [confirmed] the quantity in the box as well as the price listed in the newer processing system.

Q. I noticed in the left-hand corner that there is a long column. It looks like five-digit numbers. Do you recognize those numbers?

A. Correct, those are our product numbers we use in identifying the items in our facility.

Q. Do you recognize those as Sanford product numbers?

A. Yes, they are.

Q. And the prices which I realize are numerous different prices, but do you recognize those as being Sanford prices that you particularly sell these products for?

A. Yes, they are. Those are our standard prices.

The defense then questioned Mr. Broadous about the list. Mr. Broadous testified that he did not have the June 2000 inventory list and that he did not check every item on the second list. The trial court overruled the defendant's objection and allowed the state to introduce the second inventory list into evidence.

The defendant claims that the inventory list was inadmissible pursuant to Rule 901(a), Tenn. R. Evid., because Mr. Broadous had no personal knowledge about the contents of the list and, therefore, could not authenticate it. In support of his argument, he points out that Mr. Broadus did not prepare the list and only checked the accuracy of one or two items on the list.

Rule 901(a), Tenn. R. Evid., provides that the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Authentication can be established through the testimony of a witness with knowledge "that a matter is what it is

claimed to be." Tenn. R. Evid. 901(b)(1). The admission of demonstrative evidence is within the discretion of the trial court. State v. West, 767 S.W.2d 387, 402 (Tenn. 1989).

We believe that Mr. Broadous authenticated the inventory list. Mr. Broadous identified the list and testified that it contained every Sanford item that was recovered from the defendant's and Mr. Western's rooms. In addition, he stated that the list showed a product number and wholesale price for each stolen pen. He said that he was familiar with Sanford's prices and product numbers and that the prices and product numbers on the list were Sanford's prices and product numbers. Although Mr. Broadous did not prepare the list himself, he directed an employee to prepare it and he checked the list briefly for accuracy. In light of Mr. Broadous's testimony, we conclude that the trial court properly admitted the inventory list into evidence. In any event, the purpose of the list was to illustrate the total wholesale value of the stolen ink pens. Mr. Adolf and Mr. Broadous both testified that the total wholesale value of the pens was over $1,000. Thus, any error would be harmless because the witnesses' testimony was sufficient to establish the pens' value.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE

-7-