IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 18, 2008 Session

**STATE OF TENNESSEE v. WILLIE R. DYER**

**Appeal from the Circuit Court for Warren County**
**No. M-10846    Larry B. Stanley, Jr., Judge**

_____

**No. M2007-02397-CCA-R3-CD - Filed November 19, 2008**

_____

Willie R. Dyer was indicted for driving under the influence of an intoxicant and driving with a blood alcohol level of over .08 percent. During the jury trial, the trial court dismissed the indictment with prejudice on the basis that the chain of custody for the blood sample was inadequate. Subsequently, the State appealed. We determine that the trial court abused its discretion where the evidence was sufficient to establish chain of custody of the blood sample and, therefore, reverse and remand the judgment of the trial court for reinstatement of the indictment. Further, we determine that principles of double jeopardy do not bar retrial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed and Remanded.**

JERRY L. SMITH, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Dale Potter, District Attorney General and Josh Crain Assistant District Attorney General, for the appellant, State of Tennessee.

Robert W. Newman, at trial and on appeal, and John P. Partin, on appeal, McMinnville, Tennessee, for the appellee, Willie R. Dyer.

**OPINION**

Appellee was indicted in August of 2006 by the Warren County Grand Jury for driving under the influence ("DUI") and driving with a blood alcohol concentration of .08 percent or more. The case proceeded to a jury trial in August of 2007.

At trial, during the opening statement of the prosecutor, counsel for Appellee objected to any mention of the blood alcohol concentration. According to counsel for Appellee, there were some "chain of custody" issues with the blood alcohol test. The trial court overruled the objection but admonished counsel for the State that if the results of the test were later deemed inadmissible and the prosecutor referred to the results in opening statement that the trial court would declare a mistrial "with prejudice." During opening statements, the prosecutor informed the jury that the blood alcohol test revealed that Appellee's blood alcohol concentration was .12 percent.

The State presented Officer Mark Mara, a patrol officer with the McMinnville Police Department. Officer Mara stated that on April 15, 2006, while on routine patrol, he noticed that there were three vehicles traveling westbound on Highway 70 bypass between Old Smithville and Sunset. The three vehicles were driving in close proximity in the same lane and looked kind of like a "snake, there was somebody that was weaving in the lane." Officer Mara initiated a traffic stop of Appellee. When Officer Mara approached Appellee he noticed that he had red, watery eyes and smelled of alcohol. Appellee informed Officer Mara that he had one or two beers earlier that evening.

Officer Mara asked Appellee to step out of the vehicle and perform several sobriety tasks: the walk-and-turn, the one-legged stand, the finger-to-nose, and reciting the alphabet. According to Officer Mara, Appellee put his foot down, raised his arms, and swayed back and forth while performing the one-legged stand. Further, Appellee was not able to touch his finger to the tip of his nose. Officer Mara stated that when he instructed Appellee to recite the alphabet beginning at the letter "C" and ending with the letter "T", Appellee "missed a couple of letters" and then stopped reciting the alphabet altogether. At that point, Officer Mara placed Appellee under arrest for DUI.

Appellee was transported to the Warren County Sheriff's office. Appellee signed the implied consent form which authorized the withdrawal of a blood sample. Officer Mara took Appellee to the emergency room at "River Park" hospital where Officer Mara watched "a nurse" draw the sample of blood from Appellee. Officer Mara supplied the "blood kit" from the trunk of his patrol car. After the blood was drawn, Officer Mara took the blood kit back to "headquarters" by transporting it in the trunk of his patrol car. Once at headquarters, Officer Mara processed Appellee and then put the blood sample in an evidence bag, filled out paperwork, and placed it in an evidence locker that is locked and only accessible by the evidence technician. The sample then "goes to the evidence technician and then he either sends it or takes it to the TBI [Tennessee Bureau of Investigation]."

Once Officer Mara transported Appellee back to the police station, Appellee waived his constitutional rights and admitted that he had consumed four or five beers before driving that evening.

On cross-examination by counsel for Appellee, Officer Mara admitted that he did not know the identity of the person who drew Appellee's blood at the hospital. He read the name of the person from the form supplied by the hospital. He was also unable to verify if Appellee's blood was

properly drawn. Further, Officer Mara admitted that he was not the person who sent the blood to the TBI to be tested.

The State also presented the testimony of Jeff Crews, a special agent forensic scientist with the TBI Crime Laboratory. Special Agent Crews testified that he examined the sample of Appellee's blood and that the sample was hand-delivered to the TBI on April 19, 2006. He received the test kit from the evidence technician. Officer Crews did not actually receive the sample into the TBI lab. The sample was requested by Officer Mara and was submitted to the lab by Mike Durham. Officer Crews actually tested the sample for analysis and had "no reason to believe the blood sample wasn't in good condition."

At that point, counsel for Appellee moved to exclude the results of the analysis of Appellee's blood sample on the bases that the State failed to adequately demonstrate the chain of custody or that Appellee's blood was properly drawn. The trial court agreed, finding:

> The Defendant's blood alcohol test result is deemed to be of insufficient reliability given the inadequate proof as to the chain of custody of the blood sample, and is therefore excluded as evidence.

> The result had previously been published to the Jury in the State's opening statement, despite the Court's admonition that dismissal would follow if the result was not subsequently admitted into evidence.

The trial court dismissed the indictment and the case with prejudice. The State filed a timely notice of appeal and challenges the trial court's decision to dismiss the indictment.

*Analysis*

On appeal, the State argues that the trial court abused its discretion by excluding the results of the blood alcohol analysis because the "identity and integrity of the blood sample were never in question, [and] the State adequately demonstrated the chain of custody." As a result, the State concludes that the trial court erred in dismissing the indictment and declaring a mistrial. Appellee disagrees, arguing that there was no abuse of discretion and that reinstatement of the indictment would subject Appellee to double jeopardy.

As a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody. *State v. Goodman*, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982). The purpose of the chain of custody requirement is to "demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). While the State is not required to establish facts which exclude every possibility of tampering, the circumstances established must reasonably assure the identity of the evidence and its integrity. *State v. Ferguson*, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987). This rule does not require absolute certainty of identification. *Ritter*

*v. State*, 462 S.W.2d 247, 250 (Tenn. Crim. App. 1970). Absent sufficient proof of the chain of custody, however, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." Neil P. Cohen et al., *Tennessee Law of Evidence* § 9.01[13][c] (4th ed. 2000). A leading treatise on evidence explains:

> The concept of a "chain" of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis. Obviously, any of these persons might have the opportunity to tamper with, confuse, misplace, damage, substitute, lose and replace, or otherwise alter the evidence or to observe another doing so. Each person who has custody or control of the evidence during this time is a "link" in the chain of custody. Generally, testimony from each link is needed to verify the authenticity of the evidence and to show that it is what it purports to be. Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession.

*Id.* The issue addresses itself to the sound discretion of the trial court; its determination will not be disturbed in the absence of a clearly mistaken exercise of such discretion. *State v. Beech*, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987); *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). Reasonable assurance, rather than absolute assurance, is the prerequisite for admission.

In the past this Court has examined factual scenarios that are similar to the case herein. In *State v. Terry Scott*, No. E2003-00360-CCA-R3-CD, 2003 WL 22326980 (Tenn. Crim. App., at Knoxville, Oct. 9, 2003), the defendant was convicted of DUI. On appeal, he argued that the State failed to prove a proper chain of custody for his blood sample. *Id.* at *1. The defendant was transported to the hospital in an ambulance from the scene of an automobile accident. The police officer was present at the hospital when the blood was drawn and personally packaged and shipped the sample to the TBI. *Id.* The samples were received by the TBI and logged by an evidence clerk. A special agent with the TBI performed the drug screen. The person who tested the sample at the TBI did not testify. *Id.* This Court determined that the "testimony of [the police officer] and [the TBI evidence clerk] provided the beginning and ending 'links' of the chain. The position of [the technician who tested the sample] was established by [the evidence clerk's] testimony and documented by standard TBI records." *Id.* at *3 (citing *State v. Bobby Wells, Jr.*, No. E2000-01496-CCA-R3-CD, 2001 WL 725305 (Tenn. Crim. App., at Knoxville, June 28, 2001), *perm. app. denied*, (Tenn. Oct. 1, 2001) (finding sufficient chain of custody for admission of drug evidence notwithstanding failure of TBI lab technician who received and logged the evidence to testify)). We determined that the testimony introduced along with the fact that there was no evidence of tampering with the blood samples amounted to a proper basis for the admission of the testing. *Terry Scott*, 2003 WL 22326980, at *3.

Additionally, in a case with a strikingly similar set of facts to this case, this Court determined that the trial court properly admitted the results of the blood alcohol test despite the lack of testimony from the hospital employee who drew the blood from the defendant and the testimony from the TBI employee who received the blood sample at the TBI laboratory. *State v. Michael Joseph Arbuckle*, No. M2000-2885-CCA-R3-CD, 2001 WL 1545494, at *2-3 (Tenn. Crim. App., at Nashville, Dec. 5, 2001), *perm. app. denied*, (Tenn. May 28, 2002). In *Michael Joseph Arbuckle*, the State presented the testimony of the police officer who observed the blood sample being drawn. *Id.* at *3. The officer was responsible for placing the sample in the evidence locker to be mailed to the TBI. The trial court also heard testimony from the TBI agent regarding the procedure for documenting and receiving blood samples and that there was no evidence of tampering of the blood sample. *Id.* We upheld the admission of the blood alcohol test and determined that the State's proof of chain of custody was sufficient. *Id.*

The facts of the case herein reveal that Officer Mara took Appellee to the hospital and witnessed what he believed to be a nurse or a nurse practitioner draw Appellee's blood and place it into the blood kit that Officer Mara provided. There is no indication that his belief was incorrect. Officer Mara testified that he placed the blood kit in the trunk of his car and transported it back to police headquarters where he placed it in an evidence bag and put it inside an evidence locker. The key to the evidence locker is possessed only by the evidence technician at the police department. Special Agent Crews testified that the blood sample was hand-delivered to the TBI by Mike Durham and received by the TBI evidence technicians. Special Agent Crews explained the TBI procedure for the receipt and processing of blood samples. The sample was sealed when it was received by Special Agent Crews, and he had "no reason to believe the blood sample wasn't in good condition."

We determine that the State sufficiently established the chain of custody of the blood sample. Therefore, the trial court erred in excluding the results of the blood test, dismissing the indictment, and dismissing the case with prejudice. Accordingly, we reverse and remand this case for reinstatement of the indictment and a new trial.

*Double Jeopardy*

Although the Court has determined that the trial court erred with respect to the issue of the chain of custody of the blood sample, that determination does not resolve the disposition of this appeal. The question remains whether a retrial of Appellee is barred by the double jeopardy protections of the federal and state constitutions.

The double jeopardy clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb . . . ." Article 1, section 10 of the Tennessee Constitution contains a similar provision. As our supreme court has noted many times, the three fundamental principles underlying double jeopardy provide protections against: (1) a second prosecution after an acquittal; (2) a second prosecution after conviction; and (3) multiple punishments for the same offense. *State v. Denton*, 938 S.W.2d 373,

378 (Tenn. 1996); *see also North Carolina v. Pearce*, 395 U.S. 711 (1969), *overruled in part by Alabama v. Smith*, 490 U.S. 794 (1989).

Where the trial is terminated over the objection of the defendant the test for lifting the double jeopardy bar to a second trial is the "manifest necessity" standard first enunciated by Justice Story's opinion for the Court in United States v. Perez, 22 U.S. 579 (1824), and adopted in Tennessee in Mahala v. State, 18 Tenn. 532, 536 (1837). Although Perez dealt with the most common form of "manifest necessity," the declaration of a mistrial following a jury's inability to reach a verdict, the principle stated therein applies generally.

> [T]he law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greater caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

*Perez*, 22 U.S. at 580. The doctrine of "manifest necessity" safeguards the accused's right to have his trial completed by a particular tribunal, while at the same time preserving "the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689 (1949); *See also Arizona v. Washington*, 434 U.S. 497, 505 (1978); *Etter v. State*, 205 S.W.2d 1, 3 (1947).

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. See Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The decision whether to grant a mistrial is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). For this reason, an appellate court's review should provide considerable deference to the trial court's ruling in determining whether an occurrence or event at trial has so prejudiced the defendant or the State as to preclude a fair and impartial verdict. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). However, as noted, if the trial court does grant a mistrial over the objection of the defendant without a "manifest necessity" for doing so, double jeopardy concerns will prohibit a retrial of the defendant.

In determining whether there is a "manifest necessity" for a mistrial, "'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993) (citation omitted). Only when there is "no feasible

alternative to halting the proceedings" can a manifest necessity be shown. <u>State v. Knight</u>, 616 S.W.2d 593, 596 (Tenn. 1981).

In the instant case the State maintains that there was no manifest necessity for the declaration of a mistrial, but argues that Appellee consented to the grant of the mistrial and dismissal of the case with prejudice.[1] Appellee argues that if he is found to have consented to the grant of the mistrial it was because he was provoked by the action of the prosecutor in disclosing the results of the blood-alcohol test during opening argument.

We agree with the State that there was no manifest necessity for a mistrial. Having excluded from evidence the results of Appellee's blood alcohol test, the trial court could have instructed the jury that the opening statement of the prosecutor is not evidence and that the panel should not consider the reference to the test results as such. This is typically the manner in which references in opening statements to evidence that is later excluded is handled. This is not to say that such a situation may never create manifest necessity for a mistrial. However, in the present case evidence of Appellee's guilt, other than the blood test results, was strong. As Officer Mara testified Appellee's car was weaving in traffic, he had red and watery eyes and smelled of alcohol. Appellee admitted to drinking one or two beers, and he failed four field sobriety tests. Under the circumstances the drastic remedy of a mistrial because of the reference to the blood test in the prosecutor's opening statement was not warranted.

As argued by the State, it is true that consent by a criminal defendant to a mistrial waives any claim of double jeopardy protection from a retrial. *Knight*, 616 S.W.2d at 596; *State v. Nixon*, 669 S.W.2d 679, 681 (Tenn. Crim. App. 1983). An exception to this rule arises when the prosecution provokes the defendant into moving for a mistrial. Under those circumstances double jeopardy will bar re-prosecution even if the defendant moves for a mistrial. *Id.*

In the instant case, Appellee did not move for a mistrial, but he appears to have more or less consented to it. When the issue of the admissibility of the blood-alcohol test sample first arose and the trial judge brought up the possibility of a mistrial should the evidence be deemed inadmissible Appellee's counsel first states, "Well, we don't need to have a mistrial." The trial court then says, "Well, with prejudice." Appellee's counsel responds, "If it's a mistrial with prejudice." Appellee offers no further resistance to the declaration of a mistrial should the prosecution fail in its efforts to have the results of the blood test admitted. A defendant should be accountable for an implied consent to a declaration of mistrial when his "responses appear calculated to encourage the trial court to grant a mistrial, without making his consent express." *State v. Stephens*, No. E2005-01925-CCA-R9-C0, 2006 WL 2924960, at *8 (Tenn. Crim. App. Oct. 13, 2006) (Witt, J., concurring) (quoting *State v. White*, 369, N.W.2d 301, 304 (Minn. App. 1985)). At no time does it appear that the

---

[1] In its brief the State also makes the rather remarkable suggestion that even in the absence of a manifest necessity to declare a mistrial, double jeopardy will not bar a retrial so long as the trial judge *believes* there is a manifest necessity. We have been unable to find any authority to support this proposition, but it should be noted that if the argument were correct double jeopardy principles would almost never prohibit a retrial since the trial judges rarely, if ever, grant a mistrial without believing such action is necessary.

assistant district attorney was goading or provoking Appellee's attorney to actively seek a mistrial.[2] This appears to be a case where both parties believed in their positions with regard to the evidentiary issue and argued their respective positions in good faith.

Appellee's reliance on *Stephens* to support his position that a retrial following a mistrial without manifest necessity is barred in this case in misplaced. In *Stephens*, the defendant affirmatively stated his objection to the declaration of the mistrial. In the instant case it appears that Appellee at least implicitly consented to the mistrial so long as the indictment was dismissed with prejudice. We hold that under the circumstances, principles of double jeopardy do not bar the retrial of Appellee.

## *Conclusion*

For the foregoing reasons, the judgment of the trial court is reversed and remanded for reinstatement of the indictment and a new trial.

_____
JERRY L. SMITH, JUDGE

---

[2]Indeed it is arguable that the provocation exception discussed in *Nixon* only applies to a defendant's affirmative motion for a mistrial, and there was no active pursuit of such a motion in this case.